UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
SYRACUSE DIVISION

=============================================

ERIC J. ELDRED, JR., on behalf of himself
and those similarly situated,

                    Plaintiffs,

        -against-

COMFORCE CORP., d/b/a Comforce Telecom, Inc.,
Comforce Information Technologies, Inc., Comforce
Technical Services, Inc., Comforce Technical, LLC,
Comforce Operating, Inc., Sumtec Corp., and Prestige-
Comforce Professional Services; JOHN FANNING,
individually and in his capacity as Chairman and Chief
Executive Officer of Comforce Corp., Comforce
Information Tech., Inc., and Comforce Operating;
HARRY MACCARRONE, individually and in his
capacity as Chairman and Chief Executive Officer of
Comforce Telecom, Inc., Comforce Technical
Services, Inc., and Sumtec Corp.; PETER PETIX,
individually and in his capacity as Vice President and
General Manager of Comforce Telecom, Inc.; the
COMMUNICATION WORKERS of AMERICA;
ANDY MILBURN, individually and in his capacity as
Vice-President of CWA District 6; RICHARD
KNEUPPER, individually and in his capacity as
Assistant to District Vice-President of CWA District
6;  DONNA BENTLEY, individually and in her
capacity as CWA Staff Representative in District 6;
CWA LOCAL 6171; ALAN WHITTAKER,
individually and in his capacity as President of CWA
Local 6171; MIKE SIMMONS, individually and in his
past capacity as President of CWA Local 6171; and
LINDA JAMES, individually and in her capacity as
Executive Vice-President of CWA Local 6171;

                    Defendants.

=============================================

COMPLAINT

JURY TRIAL DEMANDED

CIVIL CASE NO.:_____


_____

CLASS ACTION

and

RACKETEER INFLUENCED and
CORRUPT ORGANIZATIONS
ACT
_____

## NATURE OF THE CASE

1.      The stated Congressional intent behind enactment of the Labor Management

Relations Act is as follows:

> It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.

29 USCS § 141 (b)

2.      This action seeks redress for the corrupt practices committed in concert by plaintiff's employer, Comforce Corp. ("Comforce"), and plaintiff's union, the Communication Workers of America (the "CWA"), that illegally exploited the traditional employer/union relationship for the financial gain of the defendants. The concerted actions of the defendants resulted in substantial economic loss to the plaintiff and to the Comforce employees and CWA union members who plaintiff represents in this action.

3.      One of the many businesses conducted by Comforce is the installation of telecommunications equipment.

4.      Plaintiff Eric Eldred was employed by defendant Comforce from 1997 until at least November 1, 2005, the exact date of his separation being in dispute.

5.      Plaintiff began his employment with Comforce working as an installer and rose to the level of engineer/supervisor. Basically, the plaintiff would receive a call from Comforce regarding an upcoming project and would be required to travel to the job location where he

would remain for the duration of the job.  Thereafter, he would either return home or continue immediately to another job site.

6.    During most of plaintiff's employment by Comforce, the company deducted union dues from his paychecks.  Comforce never asked the plaintiff if he wanted to join the union and plaintiff never gave Comforce a written, signed authorization for dues to be withheld from his paycheck.  The plaintiff was only told that he was working in a "pay to play" system in which he had to be a union member to work on projects that require union labor.

7.    In situations where Comforce was awarded a contract on a project that required union labor, they would contact the Communications Workers of America, Local 6171 in Krum, Texas and arrange for temporary union cards to be issued to the plaintiff and other class members.  Interestingly, Comforce had this arrangement with Local 6171 in Texas although there are CWA locals in New York where the plaintiff and many other similarly situated class members reside.

8.    In fact, plaintiff did not receive true or meaningful union representation in exchange for his dues.  Rather, the arrangement between Comforce and CWA Local 6171 was an enterprise designed to extract money from plaintiff and other similarly situated employees of Comforce.  This sweetheart arrangement had Local 6171 look the other way while Comforce violated various federal and state laws that resulted in a substantial economic loss to the plaintiff and the other class members he represents.

9.    Specifically and as hereinafter alleged, Comforce failed to pay plaintiff and members of the class overtime wages required by the Fair Labor Standards Act at 29 U.S.C. §216 and 29 CFR §553; made unauthorized deductions from plaintiff's wages and those of similarly situated employees in violation of Section 193 of the New York Labor Law; and failed

to pay plaintiff and other members of the class prevailing wages, per diem and mileage reimbursement as required by the Davis-Bacon Act and state labor laws.

10.     Despite paying union dues, plaintiff and other similarly situated employees had no union representation to rely on with regard to these violations.    Plaintiff never met with any union representatives on his projects (there were none), never had any communication with any union offices (the telephone number on the card was for a "representative" who merely directed him back to Comforce Human Resources), and never received any union materials other than a temporary membership card issued to him for the duration of the project (in lieu of mailing cards, they were often issued electronically to a Comforce database).

11.     Quite simply, the plaintiff and his fellow class members were pawns in a scheme to defraud carried out by the defendants herein.  Comforce, and its named employee defendants, benefited financially from the scheme by being awarded multimillion dollar contracts on projects that required union labor, and by underpaying the plaintiff and others who had no union representation to protect their interests.   The Communication Workers of America and Local 6171 benefited from the scheme by receiving dues without having to provide any true or meaningful representation to the plaintiff or his fellow class members.

12.     In addition to harming the plaintiff and his fellow class members, the arrangement between Comforce and CWA Local 6171 harmed the public at large.  The scheme enabled Comforce to avoid paying prevailing wages, statutory overtime and required per diem and mileage reimbursement on federally financed projects so that the company could unfairly and illegally underbid its competitors.   The scheme also undermined the integrity of union representation as guaranteed by the Labor Management Relations Act.

13.     The true nature of the Comforce/Communication Workers of America relationship was best described by the current Local 6171 President during a recorded telephone call when he stated as follows, "*I think there's something crooked about the relationship, I don't know exactly what it is, but I do think there's something crooked about it.*"

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §§185 and 187 (LMRA); 29 U.S.C. §§ 201-219 (FLSA); 18 U.S.C. §§ 1961, 1962 and 1964 (RICO); 28 U.S.C. §§ 1331 (Federal Question); 28 U.S.C. § 1339 (Postal Matters) and 28 U.S.C. § 1367 (State Claims).

15.     The Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. § 1965(a), (b) and (d).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. § 1965(a) and (b).

## PARTIES TO THIS ACTION

### The Individual and Class Plaintiffs

17.     At all times materially relevant to this complaint, the plaintiff Eric Eldred has resided in Norwich, New York within the Northern District of New York.

18.     Plaintiff began working for Comforce and/or one of its wholly-owned subsidiaries in 1997 as an installer of telecommunications equipment.  Within months of the commencement of his employment with Comforce, he was entered into the Communication Workers of America ("CWA") union by Comforce.

19.     Upon information and belief, at all times relevant hereto was and still is a member of CWA Local 6171, with offices in Krum, Texas.

20.     The First, Second and Third Claims for Relief are claims against defendant Comforce for violation of §193 of the New York Labor Law (First Claim), violation of 29 U.S.C. §216 (Second Claim) and violation of §198 of the New York Labor Law (Third Claim).  These claims are independent from the remaining claims brought jointly against Comforce, CWA and Local 6171.

21.     The proper similarly situated class of individuals for the First, Second and Third Claims for Relief are all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers and,

    a)     Had wages withheld from their pay checks for, but not necessarily limited to, union dues without having provided a signed authorization for Comforce to withhold wages; or

    b)     Were not paid overtime for all hours worked in excess of 40 hours per week; or

    c)     Worked for Comforce on a project that was federally funded and did not receive prevailing wages, or per diem or mileage reimbursement as required by the Davis-Bacon Act and/or state law.

22.     Upon information and belief, this class of persons consists of not less than 187 persons and very well may exceed 1,000.  Said class is so numerous that joinder of all members is impracticable under the standards of Federal Rule of Civil Procedure § 23 (a) (1).

23.     The proper similarly situated class of individuals for the Fourth, Fifth, Sixth and Ninth and Tenth Claims for Relief are all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers *and* were members of CWA who,

    a)     Paid union dues;

    b)     Were issued union membership cards;

c)      Were employed by Comforce and purportedly covered by a collective bargaining agreement between CWA and Comforce; and

d)      Received no true or meaningful representation in exchange for the union dues and incurred economic harm as set forth in the First, Second and Third Claims for Relief.

24.     Upon information and belief, this class of persons consists of not less than 187 persons. Said class is so numerous that joinder of all members is impracticable under the standards of Federal Rule of Civil Procedure § 23 (a) (1).

25.     There are questions of law and fact common to each of the above-described classes that predominate over any questions affecting only individual members. Only the amount of individual damages sustained by each class member will vary.

26.     The claims of the named plaintiff are typical of the claims of each of the above-described classes in that all of the members of each class have been similarly affected by the acts and practices of the defendants.

27.     The named plaintiff will fairly and adequately protect the interest of the members of each of the above-described classes, and his interests are not adverse to the interests of the other members of either class.

28.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy under the standards of Federal rule of Civil Procedure § 23 (b)(3).

**The Defendants Generally**

29.     There are two categories of defendants. The first being Comforce together with its subsidiaries. The second being CWA together with Local 6171.

### *The Comforce Defendants*

30.    Comforce is a professional staffing company headquartered at 415 Crossways Park Drive, Woodbury, New York, 11797.  It has numerous subsidiaries including, but not limited to, Comforce Telecom, Inc.; Comforce Information Technologies, Inc.; Comforce Technical Services, Inc.; Comforce Technical, LLC; Comforce Operating, Inc.; and Sumtec Corporation that are all also located at 415 Crossways Park Drive, Woodbury, New York, 11797. Other Comforce subsidiaries are Comforce Telecom, Inc. located at 20 Crossways Park Drive N, Suite 200, Woodbury, New York 11797; Prestige-Comforce Professional Services ("PCPS") located at 801 North Jupiter Road, Suite 102, Plano, Texas, 75074; Comforce Staffing Inc. located at 5795 Widewaters Parkway, Syracuse, New York 13214; and Comforce Technical Services located at 1000 Pittsford-Victor Road, Pittsford, New York 14534.

### *The CWA Defendants*

31.    The defendant CWA is a union representing individuals employed primarily in the telecommunications industry.  CWA is headquartered in Washington, D.C. and maintains local offices for regional and local unions throughout the United States.

32.    Upon information and belief, CWA entered into a collective bargaining agreement with Comforce or one of its subsidiaries sometime before 2003 that purportedly provided collective bargaining rights and benefits to the plaintiff and similarly situated persons.

33.    The defendant Local 6171 is a CWA local with offices in Krum, Texas.  It is through this local that the plaintiff was a member of the CWA.

34.    In 2003, Local 6171 entered into a collective bargaining agreement with Comforce through one of its subsidiaries and that agreement purportedly provided collective

bargaining rights and benefits to the plaintiff and those similarly situated.  A copy of that contract is attached hereto as Exhibit "1."

35.     Upon information and belief, Comforce, CWA and Local 6171 participated in a pattern of illegal racketeering activities, whose purposes and benefits included increasing Comforce's share of the interstate business of installing and servicing telecommunications equipment, provided money for the CWA without having to provide anything of value in exchange for said money, and, more plainly, increased money and power for all participants in the enterprise.

## Individual Comforce Defendants

36.     Upon information and belief, the defendant Harry Maccarrone ("Maccarrone") is the Chairman and/or Chief Executive Officer of at least three principle subsidiaries of Comforce, (i.e., Comforce Telecom, Inc., Comforce Technical Services, Inc., and Sumtec Corporation).  All three companies are headquartered at 415 Crossways Park Drive, Woodbury, New York, 11797.

37.     Upon information and belief, as Chairman and Chief Executive officer of the above Comforce entities, Maccarrone was responsible for those entities entering into contracts with customers for the installation, maintenance and/or repair of telecommunication equipment and for the negotiation, execution and/or administration of collective bargaining agreements between Comforce and recognized unions.

38.     The defendant John Fanning ("Fanning") is the Chairman and/or Chief Executive Officer of Comforce Corp. of at least two principle subsidiaries (i.e., being Comforce Information Tech., Inc. and Comforce Operating, Inc).  All three companies of which Fanning is Chairman are headquartered at 415 Crossways Park Drive, Woodbury, New York, 11797.

39.     Upon information and belief, as Chairman and Chief Executive officer of the above Comforce entities, Fanning was responsible for overseeing the day-today activities of such entities, and for entering into contracts with customers for the installation, maintenance and/or repair of telecommunication equipment and for the negotiation, execution and/or administration of collective bargaining agreements between Comforce and recognized unions.

40.     The defendant Peter Petix ("Petix") is the Vice President and General Manager of Comforce Telecom, Inc. Upon information and belief, Petix reports directly to Maccarrone and Fanning.

41.     Upon information and belief, Petix's office is located at 20 Crossways Park Drive N, Suite 200, Woodbury, New York 11797.

42.     Upon information and belief, Petix was the person who signed the collective bargaining agreements between the defendant CWA and the defendant Comforce.

43.     Upon information and belief, Petix was also directly involved with employment related issues involving Comforce's telecommunication installation and service contracts, including the individual employment agreements with plaintiff and those similarly situated.

44.     Upon information and belief, Petix was also responsible for the negotiation, execution and/or administration of collective bargaining agreements between Comforce and recognized unions.

45.     On numerous occasions, Petix spoke directly to the plaintiff about matters related to his employment by Comforce, including his rate of pay, per diem, overtime and union status.

### The CWA National Level

46.     According to Article III of the CWA Constitution as amended July 2006, the objects of the Union are: (a) to unite the workers within its jurisdiction in a single cohesive labor union for the purpose of the collective effort; (b) to improve the conditions of the workers with respect to wages, hours, working conditions and other conditions of employment; (c) to disseminate information among the workers at respecting economic, social, political and other matters affecting their lives and welfare; (d) to advance the interests of the workers by advocating the enactment of laws beneficial to them and the defeat of a repeal of laws detrimental to them; and (e) to do all things which may be necessary or proper to secure for the workers the enjoyment of their natural rights.

47.     According to Article VII of the CWA Constitution, the National level is comprised of the Convention.  The Convention is the entire union body within the United States represented by delegates from every CWA Local in the United States who meet at least once a year.

48.     The powers of the Convention are enumerated in Article VII, of the CWA Constitution.  These include, but are not limited to, credentialing and seating of delegates, establishing and/or revoking charters of Locals and Districts, and determining the number of Executive Vice-Presidents.

49.     Under Articles VI, VII and X of the CWA Constitution, at each Convention, the delegate body of the Convention elects individuals to the Executive Committee positions of President, Executive Vice-President, and Secretary-Treasurer.

50.     Under Article IX and §5 of Article XII of the CWA Constitution, the Executive Board is comprised of Executive Committee as well as the positions of District Vice-Presidents

and Sector-Division Vice-Presidents including the Telecommunications Sector ("Telecomm Vice-President").

51.    Under §§4-6 of Article XII of the CWA Constitution, the Telecom Vice-President and District Vice-President's act under direction from, and are assigned duties by, the President and the Executive Board.

52.    The Telecom Vice-President is elected at the annual Convention.

53.    Under §6 of Article XII of the CWA Constitution, the Telecom Vice-President is elected to represent the interests of bargaining units of telecommunications employees who work for companies that are national in scope or employ union members.

54.    Under §5 of Article XII of the CWA Constitution, District Vice-Presidents along with the Telecom Vice-President are responsible for appointing members of bargaining committees, supervising the negotiations of contracts, and approving or authorizing the approval of such contracts in accordance with direction from the National Executive Board.

55.    Under §5 of Article XII of the CWA Constitution, District Vice-Presidents along with the Telecom Vice-President are also responsible for designating a Union representative to assist in the negotiation and administration of each and every CWA collective bargaining agreement and to process any and all grievances above the Local level.

56.    The offices of the CWA Sector/Division Vice-Presidents and the Executive Committee members are located at 501 3rd Street NW, Washington, D.C. 20001.

57.    James Gurganus has been the Telecom Vice-President responsible for the operation of the Telecom Sector/Division of the CWA from at least 2004 to the present.

**The CWA District Level**

58.    CWA District 6 ("District 6") is responsible for the supervision of all CWA local unions situated within the states of Arkansas, Kansas, Missouri, Oklahoma and Texas.

59.    Under Article XI of the CWA Constitution, a District 6 Vice-President is elected for each of the five states located within the geographic boundaries of the District.

60.    Under §5 of Article XII of the CWA Constitution, the District Vice-Presidents along with the CWA Telecom Vice-President are responsible for appointing members of bargaining committees, supervising the negotiations of contracts, and approving or authorizing the execution of such contracts in accordance with direction from the National Executive Board.

61.    Under §5 of Article XII of the CWA Constitution, District Vice-Presidents along with the CWA Telecom Vice-President are also responsible for designating a Union representative to assist in the negotiations and administration of each and every contract signed and to process any and all grievances above the Local level.

62.    The District 6 Headquarters are located at 2600 Via Fortuna Drive, Suite 260, Austin, Texas 78746 ("Austin Office").  There is also a Staff Office located at 1349 Empire Central Drive, Dallas, Texas 75247 ("Dallas Office").

63.    The current Vice-President of District 6 is Andy Milburn ("Milburn").  Under Article IX and §5 of Article XII of the CWA Constitution, Milburn is a member of the National Executive Board.

64.    Milburn works out of the CWA office in Austin, Texas and has held the position of Vice-President of District 6 since April 1, 2000.  From 1990 to 2000, Milburn was a CWA Representative and Assistant to the Vice-President for District 6.

65.     Richard Kneupper ("Kneupper") is the current Assistant to District 6 Vice-President Milburn and member of Local 6171.  Kneupper was the CWA area director for the Austin Staff office from 2000-2006, a CWA Representative from 1998-2000, and the president of Local 6171 from 1988-1998.

66.     Kneupper works out of the same CWA office in Austin, Texas as Milburn.

67.     Donna Bentley ("Bentley") has served as a CWA Staff Representative since January 2000.  Bentley works out of the CWA office in Dallas, Texas.

68.     Bentley signed for the CWA on the purported collective bargaining agreements that she provided to the plaintiff as an attachment to an email on February 23, 2006.


**The CWA Local 6171**

69.     CWA Local 6171 ("Local 6171") has administrative offices at 201 Lake Street, Krum, Texas 76249.

70.     Local 6171 provided temporary union cards to the plaintiff and those similarly situated during those periods when they were employed by Comforce on union jobs.  The cards were provided either by mail or electronically to a Comforce database.

71.     Upon information and belief, Local 6171 provided these cards upon request by Comforce through defendant Petix or through another Comforce employee who had been authorized to provide such cards by Petix, Fanning or Maccarrone.

72.     The establishment and levying of dues and assessments is a power specifically reserved by §7 of Article XI of the CWA Constitution to Locals and a portion of the monies collected are forwarded to the National Convention.

73.    The current President of Local 6171 is Alan Whittaker ("Whittaker").  Whittaker has been President of Local 6171 since early 2006.

74.    The previous President of Local 6171 was Mike Simmons ("Simmons"). Simmons was President during the time period when plaintiff was employed by Comforce.

75.    The previous Executive Vice-President of Local 6171 was Linda James ("James"). Upon information and belief, James is currently a CWA vice-president.

76.    During periods relevant hereto, Whittaker, Simmons and James all worked for CWA Local 6171 and are all still members of CWA Local 6171.

77.    Whittaker, Simmons and James, as officers in charge of Local 6171, are ultimately responsible for the actions conducted in the name of CWA Local 6171.  This includes responsibility for collecting money to issue union cards without providing any union representation for the plaintiff and those similarly situated.

## FACTUAL BASIS FOR CLAIMS

### Nature of Working Relationship Between the Plaintiff and Comforce

78.    Comforce works in interstate commerce in the business of obtaining contracts and providing workers to engineer, furnish and install telecommunications equipment in commercial buildings around the country.

79.    The plaintiff was hired by Comforce in 1997 as an installer at a pay rate of $12.00 per hour.  The jobs on which the plaintiff and those similarly situated worked for Comforce were not located in his hometown.  Rather, the job locations were situated around the country.  This fact required the plaintiff to travel to the work site and remain there for several weeks or months until the installation was completed.

80. In addition to his hourly rate, plaintiff and those similarly situated were to receive a per diem rate for lodging, travel to and from their motels to the workplace, meals and laundry. The actual per diem rate depended on the location of the city where the job is located.

81. Federal guidelines govern the per diem rate, which varies for different tier cities. Cities were divided into different tiers depending on the cost of lodging, meals and travel within the particular city.

82. In addition to the federal guidelines, Comforce would consider the contract with the vendor for each job when determining how much they would offer the plaintiff and those similarly situated for per diem compensation.

83. The custom and practice was for Comforce to bid on a job, obtain the installation contract, offer the work to their installers at the rate of pay set forth in the Comforce contract with the customer and at a specified per diem rate for that job. Installers would have the option of accepting the work or declining and waiting for the next opportunity for more work. The plaintiff and those similarly situated rarely, if ever, declined an offer of work from Comforce, or any of its subsidiaries.

84. Some of the Comforce projects required that Comforce provide workers who were union members (a "union job") and some did not. If the project was a union job, Comforce would arrange for plaintiff and similarly situated persons to be issued temporary union cards from defendant CWA through defendant Local 6171.

85. Sometimes, plaintiff and similarly situated persons would receive a union card in the mail to carry at the job site. Other times, plaintiff and similarly situated persons would be informed that the union card had been issued electronically and that, if anyone on the job site

asked to see it, plaintiff should contact the project manager and that person would address the issue.

86.    There were several jobs on which the plaintiff and similarly situated persons did not know whether they were working on a union job or a non-union job until they received their paychecks and saw that union dues were being withheld.

87.    Comforce had a standing work place rule that prohibited all employees from speaking with another Comforce employee about the subjects of pay rates, per diem reimbursement or union status.  If an employee violated this rule, he or she would be immediately dismissed from the job site and replaced.  In such circumstances, it could be months before such employee would receive an offer for additional work.

## The Comforce – CWA Relationship

88.    During the course of their employment with Comforce or its subsidiaries, the plaintiff and those similarly situated were members of the CWA union, Local 6171 ("Local 6171").

89.    Upon information and belief, at all times relevant hereto, Local 6171 had a collective bargaining agreement with Comforce that governed the relationship, duties and responsibilities of the CWA, Comforce and the member employees, and one of the agreements is attached hereto as Exhibit "1."

90.    Exhibit "1" includes an authorization for the deduction of union dues from the members' pay.  However, neither the plaintiff nor those similarly situated ever saw or signed such an authorization while working for Comforce.  Even upon request, Comforce refused to provide a copy of the collective bargaining agreement to the plaintiff or those similarly situated.

The plaintiff did not receive a copy of the collective bargaining agreement until February 23, 2006, when one was provided to him by Donna Bentley.

91.    Although Comforce had a continuing employment relationship with plaintiff and other similarly situated installers that extended from job to job, the CWA was only involved when Comforce was awarded work on a union job that required Comforce to provide union workers. Upon information and belief, almost all, if not all, of the jobs on which the plaintiff and those similarly situated worked for Comforce were union jobs.

92.    When the work to be performed by Comforce required that it supply union workers, it would essentially use the same employees, including plaintiff and those similarly situated, that it used on all jobs.  The only difference is that Comforce would cause Local 6171 to issue union cards for these employees for the duration of that particular job.

93.    The plaintiff and most coworkers lived in the northeast, the jobs on which they worked were located primarily in the northeast, and there were CWA locals throughout the northeast.  Nevertheless, Comforce had the plaintiff and other employees admitted to Local 6171 located in Krum, Texas.

94.    Local 6171 is situated approximately 40 miles from the Comforce subsidiary headquarters of Prestige Comforce Professional Services ("PCPS"), located in Plano, Texas. PCPS has frequently been shown as the "pay group" on plaintiff's paychecks for work he performed on union jobs throughout the course of his employment by Comforce.   Upon information and belief, other similarly situated Comforce employees also received PCPS paychecks.

## No Union Representation Provided

95.    Plaintiff and those similarly situated never had any direct contact with any Local 6171 representative or any other CWA representative at the job site at any time during the years they worked for Comforce, or its subsidiaries.

96.    Plaintiff and those similarly situated Comforce employees were not provided with a copy of the CWA collective bargaining agreement, until plaintiff's repeated demands for the contract resulted in Bentley providing him one on February 23, 2006.

97.    Moreover, plaintiff and those similarly situated Comforce employees never received any information from either CWA or Comforce regarding their rights and responsibilities as union members, never had a shop steward or other union representative at a job location, were never provided with any information regarding a formal grievance process, and were never provided any information on how to contact a union representative.

98.    Also, plaintiff and those similarly situated were never advised of their rights under *N.L.R.B. v. General Motors* to opt out of the union membership and pay, as a non-member, an amount equivalent to union initiation fees and dues.

99.    Similarly, the CWA failed to advise the plaintiff and those similarly situated of their rights as non-member employees under *Communications Workers v. Beck* to elect not to have dues withheld for activities unrelated to collective bargaining.

100.    In response to requests for information as to their union status and rights, plaintiff and those similarly situated Comforce employees were told by Comforce that they had no collective bargaining agreement, no union representation, and no special rights or privileges.  It was merely a "pay to play" system wherein the plaintiff and those similarly situated had to pay money to CWA to work on union jobs.

101.   In fact, when plaintiff and those similarly situated received actual union cards early in his years with Comforce, if he attempted to contact the union through the toll-free number on the card a receptionist would answer the call and would direct him to contact the Comforce Human Resources department.

102.   The plaintiff and other similarly situated Comforce employees were specifically instructed never to discuss the union at a job location among themselves or with other trades.  If the did, they would be sent home and replaced.

103.   At one point in the plaintiff's employment by Comforce, he did inquire about the union and lack of representation and he was laid off for three months.

104.   On other occasions, when Comforce failed to pay the plaintiff the agreed upon per diem rate, he attempted to contact the Comforce Human Resources department.  They never advised him to contact a union representative but, instead, referred him to the project manager for the particular job.

### Wages Withheld Without Authorization

105.   Plaintiff never gave Comforce an authorization for union dues to be withheld from his paychecks as required by New York Labor Law § 193 or other applicable state law.

106.   Upon information and belief, other similarly situated Comforce employees did not sign the authorization found in Exhibit "1" or any other wage deduction authorization form.

107.   Upon information and belief, the practice followed by Comforce of not having wage deduction authorization forms signed by its employees may extend to employees of Comforce who work outside of telecommunications installers and may very well extend to Comforce employees who work in other industries.

**The Fraudulent Per Diem Bait and Switch That**
**Lead to the Plaintiff's Separation From Comforce**

108.    On several occasions throughout the period that plaintiff worked for Comforce or its subsidiaries, the per diem reimbursement rate that was offered to him when he accepted a specific assignment, was unilaterally reduced by Comforce after plaintiff had arrived at the job site.

109.    Upon information and belief, this same tactic was followed by Comforce with respect to other similarly situated Comforce employees during the years that plaintiff was employed by Comforce.  The last time the plaintiff encountered this bait and switch tactic was in October and November of 2005.  The attempt by Comforce to unilaterally reduce the per diem rate began a series of events that ended with plaintiff's separation of employment from Comforce.

110.    In October 2005, plaintiff received an offer from Comforce to work on an installation job in Philadelphia, Pennsylvania at the $27.50 per hour rate of pay that he had negotiated with Comforce, and a per diem reimbursement rate of $120 per day.  The plaintiff accepted the job and began preparing to leave for Philadelphia.

111.    On the day he was scheduled to travel to Philadelphia, he received a call from Comforce informing him that the per diem rate would, in fact, be either $90.00 or $95.00 per day.  The plaintiff explained that a per diem rate in that range was unacceptable.  Comforce then asked him to give them a day to rectify this and the plaintiff agreed.  He then traveled to Philadelphia with the hope and expectation that the per diem rate would be the $120 per day he had originally been offered.

112.    After he had rented a car in Binghamton, New York and prepared to travel to Philadelphia, Comforce advised the plaintiff that the per diem rate was still an issue but asked that they have until the end of the day to continue to work on it.  The plaintiff agreed and traveled to Philadelphia with hope and expectation that the rate would be the $120 as promised initially.

113.    However at the end of day, the per diem rate remained at either $90.00 or $95.00. Consequently, the plaintiff explained to Comforce that he could not accept work at that rate.  The reply by Comforce was, "… *do what you have to do*."  The plaintiff returned to Norwich, New York, leaving behind three other Comforce employees who, although were not happy with the fact that their per diem rate had been unilaterally lowered, decided that they needed the work and would remain at the job site.

114.    Thereafter, the plaintiff waited several weeks for additional work assignments from Comforce but did not receive any contact from them.  The plaintiff inquired of Comforce as to whether his employment had been terminated and he was informed that it had not.

115.    However, no work was ever offered to him again by Comforce.  It was the custom and practice of plaintiff and all other similarly situated installers employed by Comforce to apply for unemployment benefits in between jobs.  After the Philadelphia job, the plaintiff applied for and received unemployment benefits in New York.

116.    Comforce objected to the benefits and filed an appeal with the New York State Unemployment Insurance Appeals Board.  After several hearings, the Appeals Board determined that the plaintiff was separated from employment with Comforce for cause.

117.    Defendants CWA and Local 6171 did not provide plaintiff with any representation in proceedings related to his application for unemployment benefits. However,

CWA representatives did testify that the plaintiff was a member of the union while he was employed by Comforce.

118.    Neither the CWA nor Local 6171 ever initiated any proceedings to remove the plaintiff from the union as a member in good standing and plaintiff has never received any documentation stating that he is no longer a member in good standing.  As of the date of this complaint, the plaintiff, upon information and belief, is still a member of defendant CWA and Local 6171.

**Comforce's Failure to Pay Prevailing
Federal Wages and Required Per Diem**

119.    The plaintiff and other similarly situated Comforce employees learned through an email that a CWA representative, Donna Bentley, sent to the plaintiff and other similarly situated Comforce employees on June 30, 2008, that stated, *"[m]ost of the jobs undertaken by Sumtec [a Comforce subsidiary] were federal or government type jobs in different locations.  My understanding was that wages would be paid at the prevailing wage rates for each location and that would be in the employees' best interest."*  This email communication is attached hereto an Exhibit "2."

120.    The plaintiff's pay rate from August 2005 through his final job in November 2005 was $27.50 per hour as a field service engineer and/or supervisor installer.  Upon information and belief, plaintiff and other similarly situated Comforce employees were not paid the federal prevailing wages they were in fact owed on many, if not all, of the projects on which they worked for Comforce.  For example, plaintiff has been informed that the federal prevailing rate for *basic* installers beginning in 2006 was $31.61 per hour.  This rate was over $4.00 per hour higher, for a lesser experienced installer, than the rate that was paid to plaintiff.

121.    Comforce has an obligation to submit reports to the Department of Labor verifying that it has paid its employees the prevailing federal wages on projects governed by the Davis-Bacon Act.

122.    According to the email from Donna Bentley, the Davis-Bacon Act would apply to most, and possibly all, of the jobs on which the plaintiff and other similarly situated Comforce employees worked.

## Comforce Failure to Pay Overtime Rates

123.    In addition to the foregoing, Comforce failed to pay plaintiff and other similarly situated Comforce employees statutorily required overtime pay for travel time hours that caused his work week to exceed 40 hours per week.

124.    The plaintiff and other similarly situated Comforce employees were required to travel to different cities throughout the United States to work on jobs for Comforce.  Travel to and from the different cities ranged from just a few hours to 22 hours or more, depending on the distance of the city and the mode of transportation.

125.    From the beginning of his employment with Comforce in 1997 until some time in 2002, the plaintiff was compensated for his actual travel time and expenses.  However, at some point in 2002, Comforce and its subsidiaries verbally informed the plaintiff and other similarly situated Comforce employees that they would only be paid for up to four hours of travel time regardless of the total time actually required for travel to the work site.

126.    Plaintiff and other similarly situated Comforce employees complained to Comforce supervisors that they were often required to travel over four hours to and from the destinations they had been assigned by Comforce.

127.    Plaintiff and other similarly situated Comforce employees repeatedly asked Comforce to put this new practice in writing since it was contradictory to the previous practice of paying for all actual travel time.

128.    After approximately one year of applying the new four hour policy, Comforce finally reduced it to writing in what is attached as Exhibit "3", entitled "Prestige Comforce Professional Services Travel and Per Diem Policy, rev. 2/04."

129.    Exhibit "3" states on page one that travel time will be paid at the employees' current rate of pay for a maximum of four hours.  In other words, the plaintiff and other similarly situated Comforce employees were not paid for any travel time over four hours.

130.    This travel time policy is null and void as it was prepared unilaterally by Comforce without any negotiation with CWA or Local 6171, as required by the collective bargaining agreement and the Labor Relations Management Act.  Moreover, the plaintiff and other similarly situated Comforce employees should have been paid for travel time that exceeded four hours, and should have been paid at the statutory overtime rate of time and a half when applicable.

131.    Exhibit "4" is a spreadsheet provided by the plaintiff that documents his actual hours worked, rate of pay, unpaid overtime hours, rate of per diem, total per diem paid and the prevailing per diem he should have been paid.  The spreadsheet includes unpaid per diem for days the plaintiff traveled from one city to another when he was greater than 200 miles from home and should have been paid a per diem in accordance with the Comforce travel and per diem policy.

132.    Exhibit "5" are the prevailing per diem rates according to the United States General Services Administration for the times and locations that the plaintiff worked for

Comforce. Upon information and belief, the "maximum rate" referred to on the GSA documents refers to the maximum a worker could receive without receipts, which was also the minimum rate a worker was supposed to be paid for per diem reimbursement.

### The Failure of Comforce, CWA and Local 6171
### to Follow Collective Bargaining Agreement

133.    Article I, section 1 of the collective bargaining agreement states, "The Company hereby recognizes the Union as the exclusive collective bargaining representative for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment, all of its employees in the collective bargaining unit."

134.    Despite the clear language that the union was the exclusive representative for the purpose of collective bargaining with respect to rates of pay and wages, Comforce entered into individual employment agreements with the plaintiff and other similarly situated employees of Comforce.

135.    For example, Exhibit "6" is the plaintiff's employment agreement dated March 2, 2003. From the time the plaintiff and those similarly situated began to work for Comforce, they negotiated their own rates of pay and raises when appropriate.

136.    Donna Bentley states in her e-mail to the plaintiff attached as Exhibit "2" that it was her understanding that wages would be paid at the prevailing wage rate for each location and that this would be in the employee's best interests. However, the CWA and Local 6171 had a duty and obligation pursuant to the collective bargaining agreement and the Labor Management Relations Act to do more than have an "understanding" of what their member's wages would be.

In fact, the CWA should have negotiated specific rates of pay for its dues paying members, including the plaintiff and other similarly situated Comforce employees.

137.    Additionally, there were no negotiations between Comforce and the CWA or Local 6171 with regard to Comforce's travel and per diem policy.  The policy noted above that unilaterally establishes a maximum of four hours of travel time pay at only the employees' current rate of pay is clearly a mandatory subject of collective bargaining.

138.    Additionally, Article III, section 1, of the collective bargaining agreement contains a payroll deduction authorization form that Comforce, CWA or Local 6171 never had the plaintiff or other similarly situated Comforce employees execute before commencing employment with Comforce.  As such, union dues were wrongfully and illegally withheld from the paychecks of the plaintiff and other similarly situated Comforce employees in violation of the collective bargaining agreement and New York Labor Law § 193.

139.    Additionally, the grievance provisions of Article V of the collective bargaining agreement were not made known to the plaintiff or other similarly situated Comforce employees.  As such, they were not aware of any grievance rights that they had pursuant to their union membership and the collective bargaining agreement.

140.    Additionally, Article VI of the collective bargaining agreement regarding discipline was not made known to the plaintiff or followed by Comforce in its failure to offer him work after the Philadelphia, Pennsylvania job of November 1, 2005.  This section provides that no employee shall be suspended, demoted or discharged or otherwise disciplined except for just cause, that the Company shall give the employee and the appropriate union representative seven days notice prior to the effective date of any suspension, demotion or discharge action, and that the question of whether "just cause" exists shall be subject to the grievance and arbitration

procedure provided therein.  None of these rights were extended to the plaintiff before his employment with Comforce was terminated and he was never informed that he was entitled to such contract protections.

141.    Finally, Article VIII required Comforce and CWA and/or Local 6171 to meet within 60 days of the date of the collective bargaining agreement for the purpose of negotiating wages, working conditions and other conditions of employment not covered by the initial collective bargaining agreement.  In fact, the parties to the agreement never specifically set wages or specific conditions of employment.  Instead, the employees/union members, including the plaintiff and other similarly situated Comforce employees had to negotiate those items for themselves.

**Testimony Provided at the New York**
**Unemployment Insurance Appeals Board Hearings**

142.    CWA and Comforce employees testified under oath at proceedings on the plaintiff's application for unemployment benefits that is relevant to this action.

*Peter Petix:*

143.    Peter Petix is the Comforce senior vice president and general manager. He testified as follows:

  a) Admitted that Comforce or its subsidiaries required employees with union cards for certain job locations;

  b) Admitted that the employee would receive a union card but that neither Comforce, nor its subsidiaries, would send a copy of a collective bargaining agreement to the employees on union jobs;

  c) Admitted that he did not know if employees had their rights as union members and/or rights pursuant to the collective bargaining agreement explained to them;

  d) Admitted that it was up to the "recruiter" to explain such matters to the employees but that the "recruiters" in fact reported to him;

e)     Admitted that deductions were taken from the pay of employees when they worked in union buildings;

f)     Admitted that he was not familiar with the term "shop steward;"

g)     Admitted that if an employee had a grievance the employee would notify Comforce and he would have referred that employee to a union representative;

h)     Admitted he would have referred the employee to Donna Bentley at the national union office;

i)     Admitted that there were no union representatives on the job sites; and

j)     Admitted that union cards were mailed within 24 hours of the request to the job location to the supervisor for the job location.

*Alan Whittaker:*

144.     Testimony was also taken from the Local 6171 President, Alan Whittaker.  He testified as follows:

a)     Admitted that the plaintiff and other similarly situated Comforce employees were members of a union in 2002 with connection to a Comforce subsidiary known as Sumtec;

b)     Admitted that the plaintiff was in the union by job assignment as needed;

c)     Admitted that no shop steward or other union representative was assigned to the plaintiff's group while he was working with Sumtec;

d)     Admitted that he issues union cards in three month increments and then will issue a card at the end of the three-month period if necessary;

e)     Admitted that the plaintiff, and other similarly situated Comforce employees would only learn of their rights and responsibilities as union members through "contract books" that were issued to the employer for delivery to the employees in situations where temporary union cards were issued;

f)     Admitted that the "contract books" outline a grievance process, but he did not know if that process was communicated to the plaintiff, and;

g)  Admitted having no record of the plaintiff being a union member by working for a Comforce subsidiary PCPS in Philadelphia in 2005, or at any other time in 2005, despite union dues being withheld from the plaintiff's paychecks for the Philadelphia job.

145.   Further relevant testimony was taken from Kelly Hanks, the Human Resources representative for Comforce who represented it in the plaintiff's unemployment appeal hearing process.  She testified that the plaintiff spoke to her while he was employed by Comforce when he was looking for help with his per diem issues.  Ms. Hanks also testified that union dues were in fact withheld from the paychecks of the plaintiff, but that she knew nothing about the union or that it even existed.

146.   There was also testimony from a Comforce project manager, John Trailor, who admitted that the per diem rate for the plaintiff and those similarly situated was governed by federal guidelines.  He also testified that the rate actually paid by Comforce was based in part on the federal guidelines but also on the contractual agreements with the vendors.

147.   The transcripts of the testimony cited above are attached hereto as Exhibit "7".

**Plaintiff's Recorded Telephone
Conversations With CWA and Local 6171**

148.   As stated above, Whittaker testified during the Unemployment Insurance Appeals Board hearing on September 2, 2008.  In addition, the plaintiff telephoned Whittaker to inquire about the union relationship with Comforce and lack of representation for the employees, such as himself.  The telephone call was recorded by the plaintiff and a transcript is attached hereto as Exhibit "8."

149.   During the course of the telephone conversation, Whittaker at one point in addressing the union/Comforce working relationship and lack of union representation for

employees on Comforce jobs simply stated, "*I can tell you that I contacted Pete Petix and said I was not interested in, here's what it is, that is nothing more than selling fucking cards to y'all.*"

150.     Whittaker further stated, "*I only sent cards up there when the company requested them, in other words when they had a job in a union shop, . . . then they called down here for the cards and withheld the dues.*"

151.     He continued to state, "*I didn't take office until 2006, but I could see there were some issues with these temporary cards.  About six weeks ago I sent a letter to that company stating that I was no longer interested in maintaining the current relationship with them, but if they want to sit down and negotiate a true contract with wages, working conditions and benefits I was more than happy to do that.*"

152.     As an example of a "true" contract, please see a collective bargaining agreement between Local 6171 and Verizon attached hereto as Exhibit "9."

153.     Whittaker further stated, "*I have contacted those companies and told them that I will not under any circumstances continue that same relationship we had with them in the past,*" and that, "*I am not interested in doing that anymore because what it does is circumvents what we try to do as a union, . . . by ya'll going in to the Verizon location or AT&T locations where we have union members that pay dues every month and these half-ass companies go in and undercut the prices as far as installations and it hurts my regular full-time union members and in the long run costs me jobs.*"

154.     During his conversation with Whittaker, the plaintiff stated, "*When I had a crew of 10 or 15 guys I was the one working out the per diem or when a guy wanted a raise I went to the boss, you guys should have been doing this for me and everybody else.*"  To which Mr. Whittaker responded, "*Absolutely, I couldn't agree more. . . . We have to demand bargaining*

with these companies that actually includes wages schedules, benefits packages, working conditions, per diem allowances."

155.    The plaintiff further stated to Whittaker, "*They tell us that if you're asked for a union card you say it's in you car, you go out to your car and call your supervisor.*" To which Mr. Whittaker responded, "*I've got some issues with that. . . . that's what they've always done, when they called us for cards instead of sending them to your house they asked that we send them to a job location or an office somewhere, but I don't do that for Verizon or Windstream.*"

156.    The plaintiff then asked, "*What can be done for all of us that have paid union dues for all these years?*" To which Mr. Whittaker responded, "*The national holds the contract and if they have been defrauded out of dues money than ya'll are either entitled to it back from the company, because we didn't get it and the national didn't get it. . . . I think there's something crooked about the relationship, I don't know exactly what it is, but I do think there's something crooked about it.*"

### The Comforce, CWA and Local 6171 Scheme to Defraud, Extortion and Racketeering Activity

157.    Comforce knowingly and willingly entered into telecommunication installation and service contracts to provide workers for projects that required union members as well as prevailing wages and per diem be paid, along with proper overtime compensation.  In order to accept those contracts, Comforce needed its telecommunications employees, including the plaintiff and those similarly situated, to be members of a union.

158.    This need led to a scheme to defraud relationship with defendant CWA in which Comforce would withhold union dues from the paychecks of its employees, including the plaintiff and those similarly situated, have the dues wired to defendant CWA and/or defendant

Local 6171.  In exchange, CWA, through Local 6171, would issue temporary union cards to Comforce employees, including the plaintiff and those similarly situated, either by mail to the employee or electronically to a Comforce database.

159.    All along, Comforce and CWA knew that the plaintiff, and those similarly situated, would in fact receive no true or meaningful union representation in exchange for the union dues they were forced to pay.  Although a collective bargaining agreement was entered into between Comforce and CWA, the agreement was never provided to the Comforce employees.

160.    Moreover that contract was essentially a meaningless sham that provided no true benefits or representation to the plaintiff or those similarly situated.  As an example of how meaningless the collective bargaining agreement between Comforce and CWA was, it was 15 pages whereas the collective bargaining agreement between CWA and Verizon (Exhibit "9"), is 270 pages.

161.    The plaintiff and those similarly situated Comforce employees were in fact never provided any union representation for the negotiation of wages, hours, or other benefits and working conditions, as purportedly required by the collective bargaining agreement.

162.    In fact, the plaintiff and those similarly situated Comforce employees negotiated their own individual employment contracts with Comforce.  As a further example of CWA's failure to properly negotiate wages for the plaintiff or similarly situated persons, the CWA signatory to the collective bargaining agreement, Donna Bentley, stated in her e-mail (Exhibit "2") that the CWA had an understanding that most, if not all, of the Comforce projects were federally funded and therefore prevailing wages should be paid.  Clearly, CWA failed to make

any effort to negotiate wages, benefits or working conditions for its membership. Rather, it allowed the employer, Comforce, to unilaterally make such decisions.

163.    Neither CWA nor Local 6171 provided any shop steward or union representative at any job site for Comforce, and Comforce was fully aware that no such representation was present. As the plaintiff was told, the arrangement between Comforce an the CWA was essentially a "pay to play" system that compelled the plaintiff, and similarly situated persons, to have wages withheld from their pay in order to work and they received nothing in exchange except the ability to work on a project.

164.    This scheme defrauded the plaintiff, and similarly situated persons, out of not only the union dues, but also proper wages, per diem reimbursement and overtime pays that workers with true and meaningful union representation would have received.

165.    Comforce benefited from this fraudulent relationship by being awarded contracts on union jobs without having to pay the cost of actually having to recognize and deal with a true union that represented its members' interests, and thereby benefiting financially. CWA and Local 6171 benefited from the fraudulent relationship by receiving vast amounts of money in the form of union dues from the plaintiff and other similarly situated Comforce employees without having to provide any services or representation for these people in exchange.

166.    The CWA further benefited by being able to expand the membership rolls to include the plaintiff, and similarly situated persons, which was helpful to expand their influence as a union organization. Additionally, the Local 6171 was able to expand their influence within the CWA because according to the CWA Constitution, the number of voting delegates each local received for the annual national convention was based upon the number of union members the previous year.

167.    This scheme to defraud was carried out using monetary wire transfers of union dues and mailing or electronically wiring a union membership card.  A "union shop" requires employees to either join a union after accepting appointments, or choose instead to pay the equivalent of union dues, and in exchange the employees receive collective bargaining rights. Because no true or meaningful collective bargaining rights or union representation was ever provided to the plaintiff or those similarly situated in the Comforce/CWA relationship, this was not a traditional union shop, but rather a scheme to defraud carried out by mail and wire, as well as extortion under the guise of a traditional union shop.

168.    Upon information and belief, the fraud perpetrated by Comforce reaches beyond the harm caused to the plaintiff and other similarly situated employees of Comforce.  When Comforce entered into contracts to perform work on union jobs, it represented to the other contracting parties and to other contractors who may have bid on the job that they were in fact employing union members to perform the work.  The reality was that the Comforce telecommunication employees, such as the plaintiff and those similarly situated, had no true or meaningful union rights or representation.  As such, Comforce with the knowledge and consent of CWA and Local 6171 falsely and fraudulently presented the Comforce employees as union members to other contracting parties and contractors on the job.

169.    This false and fraudulent misrepresentation allowed Comforce to enter lower contract bids than true union companies, incur lower labor costs, and therefore undermined its competitors who were employing true union members for the same job.  In fact, Mr. Whittaker reached the same conclusion during his telephone conversation with the plaintiff on September 2, 2008, detailed above.

**FIRST CLAIM FOR RELIEF
AGAINST DEFENDANT COMFORCE**

**Unauthorized Withholding Of Wages**

170.    The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

171.    The plaintiff and other similarly situated employees of Comforce had wages deducted from their pay by defendant Comforce without having granted Comforce signed authorizations to do so.

172.    Comforce's act of making unauthorized deductions from the paychecks of the plaintiff and other similarly situated employees violated § 193 of the New York Labor Law.

173.    As result of the foregoing, the plaintiff and those similarly situated have been damaged in an amount to be determined at trial upon an accounting of the union dues withheld from wages of the plaintiff and those similarly situated, as well as mental anguish and emotional distress in an amount to be determined at trial.

174.    On this claim for relief, the plaintiff and those similarly situated further seek judgment against Comforce that includes an award of liquidated damages equal to 25% of the amount of their unpaid wages and award for attorneys fees as provided under New York labor Law § 198, plus interest and costs.

175.    Furthermore, defendant Comforce's conduct has been willful and contumacious. As such, the plaintiff and those similarly situated are entitled to punitive damages.

## SECOND CLAIM FOR RELIEF
## AGAINST DEFENDANT COMFORCE

### Unpaid Overtime

176.    The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

177.    The plaintiff and other similarly situated employees of Comforce bring this second claim for relief pursuant to 29 U.S.C. 216 (b).  Upon information and belief, there are numerous such similarly situated persons.

178.    Pursuant to the applicable provisions of the Fair Labor Standards Act ("FLSA") at 29 U.S.C. § 207 and the wage orders issued under the FLSA at 29 CFR § 552, the plaintiff and those similarly situated were entitled to receive an overtime hourly wage of time and one half their regular hourly wage for all hours worked in excess of 40 hours per week.

179.    The plaintiff and those similarly situated frequently worked more than 40 hours per week for Comforce when they were required to travel to and from a job location.  Defendant Comforce willfully failed to make overtime payments for any travel time that exceeded four hours even if the actual travel hours caused the total hours worked for the week to exceed 40 hours.

180.    On this claim for relief, the plaintiff on behalf of himself and other similarly situated employees of Comforce seeks a judgment for unpaid overtime wages, such sums to be determined based upon an accounting of the hours worked by, and wages actually paid to, the plaintiffs and other similarly situated employees of Comforce.  The plaintiff also seeks an award of liquidated damages in the amount of 100% of the unpaid overtime, plus attorneys fees, interest and costs as provided for by the FLSA .

**THIRD CLAIM FOR RELIEF**
**AGAINST DEFENDANT COMFORCE**

**Third Party Beneficiary and Unjust Enrichment Claims**

181.    The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

182.    Comforce entered into a contract to provide telecommunication and installation services on projects that were funded, at least in part, by money from the federal government. The plaintiff and other similarly situated employees of Comforce provided the labor for these telecommunication and installation service contracts.

183.    When Comforce entered into the aforesaid contracts, it agreed as part of the contracts and/or as a matter of law to pay the plaintiff and other similarly situated employees of Comforce prevailing wages and the per diem and mileage reimbursements established by the United States Department of Labor (DOL).

184.    The plaintiff and other similarly situated employees of Comforce were third-party beneficiaries of the aforesaid contracts and Comforce was unjustly enriched by failing to pay the required wages and per diem and mileage reimbursements.

185.    Comforce breached the contracts in that they failed to pay the plaintiff and those similarly situated the prevailing wages or the per diem and mileage reimbursements required under the contracts and/or promulgated by the Department of Labor.

186.    On this claim for relief, the plaintiff and other similarly situated employees of Comforce seek judgment for unpaid prevailing wages, and unpaid per diem and mileage

reimbursements equal to the difference between what Comforce should have paid them under the law and the amount Comforce actually paid them, plus attorneys' fees, interest and costs.

187.    On this claim for relief, the plaintiff and other similarly situated employees of Comforce further seek judgment against Comforce that includes an award of liquidated damages equal to 25% of the amount of their unpaid wages and award for attorneys fees as provided under New York labor Law § 198, plus interest and costs.


## FOURTH CLAIM FOR RELIEF AGAINST
## DEFENDANTS CWA, LOCAL 6171 and COMFORCE

### Violations of The Labor Management Relations Act

188.    The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

189.    This claim for relief is brought on behalf of the plaintiff and other similarly situated employees of Comforce who were members of CWA and Local 6171 and paid union dues to said labor organizations over a course of several years.

190.    Local 6171 and Comforce signed a purported collective bargaining agreement, attached as Exhibit "1," that provided wages, benefits and working conditions would be negotiated between defendant CWA and/or Local 6171 and Comforce.

191.    Upon information and belief, a similar document that also purported to be a collective bargaining agreement between defendants CWA and Comforce existed before the term of Exhibit "1" that also provided that wages, benefits and working conditions would be negotiated between defendant CWA, Local 6171 and Comforce.

192.    Despite the provisions of the collective bargaining agreement attached hereto as Exhibit "1" and the previous collective bargaining agreement, neither Local 6171 or CWA  ever

engaged in any true and meaningful negotiations of wages, benefits and working conditions for its dues paying members.

193.    In fact, defendant Comforce entered into individual employment contracts with the plaintiff and other similarly situated employees of Comforce contrary to the provisions of the collective bargaining agreements.  Also, defendant Comforce unilaterally promulgated a travel reimbursement policy that applied to the plaintiff and those similarly situated without negotiating the same with defendants Local 6171 or CWA.

194.    The failure of defendants Local 6171, CWA and Comforce to negotiate wages, benefits and working conditions is a violation of the Labor Management Relations Act §§ 158(a)(5); 158(b)(3) and 158(d).

195.    The plaintiff and other similarly situated employees of Comforce those similarly situated bring this cause of action for judgment against defendants Comforce, Local 6171 and CWA pursuant to §§ 185 and 187 of the Labor Management Relations Act.  By way of remedy, they seek the return of all union dues paid to defendants Local 6171 and CWA and an award equal to the amount of unpaid prevailing wages they should have received, any and all overtime not paid, and the per diem and mileage reimbursements not paid as required under law.

### FIFTH CLAIM FOR RELIEF AGAINST
### DEFENDANTS CWA AND THE LOCAL 6171

#### Violation of The Duty of Fair Representation

196.    The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

197.    Plaintiff and other similarly situated employees of Comforce paid union dues to defendants CWA and Local 6171 over a course of many years.  During that time, defendant

CWA and Local 6171 entered into purported collective bargaining agreements with defendant Comforce on behalf of its dues paying members, including the plaintiff and those similarly situated.

198.    Despite having entered a purported collective bargaining agreement with Comforce and collecting dues from the plaintiff and other similarly situated employees of Comforce, the CWA and local 6171 provided no true or meaningful representation, and never actually negotiated wages, benefits or working conditions for the plaintiff or other similarly situated employees of Comforce.

199.    As a result of defendant CWA and Local 6171 failing to provide any true or meaningful representation, the plaintiff and other similarly situated employees of Comforce suffered damages in the form of unpaid overtime, not being paid prevailing wages, and not receiving appropriate per diem or mileage reimbursements.  They were also damaged by having to pay union dues without receiving any service or benefit in return from the recipient of those dues, the CWA and Local 6171.

200.    The failure of the CWA and Local 6171 to provide true and meaningful representation despite having received union dues from the plaintiff and other similarly situated employees of Comforce is a breach of their duty of fair representation in violation of § 301 of the National Labor Relations Act.

201.    Under this claim for relief, the plaintiff and other similarly situated employees of Comforce seek damages in the amount of all paid union dues, unpaid overtime owed by defendant Comforce and unpaid prevailing wages, per diem and mileage reimbursement.

**SIXTH CLAIM FOR RELIEF AGAINST
DEFENDANTS CWA AND THE LOCAL 6171**

**Unjust Enrichment of Defendants CWA and Local 6171**

202.    The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

203.    The CWA and Local 6171 have been unjustly enriched to the detriment of the plaintiff and other similarly situated employees of Comforce in that said defendants have received union dues on a regular and ongoing basis from the plaintiff and other similarly situated employees of Comforce without having first obtained an appropriate authorization for the payment of such dues and further by not providing any true or meaningful services, benefits or representation in exchange for the union dues.

204.    As a result of the unjust enrichment of the CWA and Local 6171, the plaintiff and other similarly situated employees of Comforce have been damaged in an amount to be determined at trial upon an accounting of all union dues withheld from the plaintiff and those similarly situated during the relevant time period.

**SEVENTH CLAIM FOR RELIEF
AGAINST DEFENDANT COMFORCE**

**Labor Law Retaliation**

205.    The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

206.    Comforce has discharged, penalized and discriminated against plaintiff because he complained to Comforce about not being paid the proper per diem rates and about having

union dues withheld from his pay without receiving any true or meaningful representation from defendants CWA or Local 6171, in violation of New York Labor Law § 215.

207.    On this claim for relief, plaintiff seeks all appropriate relief, including rehiring or reinstatement to his former position with restoration of seniority, payment of lost compensation, damages and attorney's fees.

## EIGHTH CLAIM FOR RELIEF
## AGAINST DEFENDANT COMFORCE

### Wrongful Termination

208.    The plaintiff repeats each and every allegation previously made in this complaint as if set forth fully herein.

209.    At all times relevant herein, plaintiff was employed by Comforce and was a member in good standing of the CWA and Local 6171.  As such, he was entitled to all of the rights, protections, benefits and procedures set forth in the collective bargaining agreement.

210.    Article VI, Section 1 of the collective bargaining agreement states, "*No employee covered by this agreement shall be suspended, demoted or discharged or otherwise disciplined except for just cause.*"

211.    Article VI, Section 2 of the collective bargaining agreement states, "*The Company shall give the employee involved and the appropriate union representative at least seven (7) days notice prior to the effective date of any suspension, demotion or discharge action*"

212.    Article VI, Section 4 of the collective bargaining agreement states, "*The question of whether 'just cause' exists for the discipline shall be subject to the grievance and arbitration procedure provided herein.*"

213.     Comforce constructively discharged plaintiff by offering him no work after he left the Philadelphia job in November 2005.  As such, Comforce deprived plaintiff of his contractual rights and protections by not complying with the requirements of the collective bargaining agreement before refusing to offer him any additional work assignments.

214.     Comforce thereby wrongfully terminated the plaintiff's employment in violation of Article VI, Sections 1, 2 and 4 of the collective bargaining agreement.

215.     As a direct and proximate result of Comforce's acts as set forth herein, the plaintiff was unjustly and wrongfully disciplined and terminated as an employee of Comforce, thereby suffering monetary damages, as well as humiliation, emotional distress, mental anguish and suffering, and damage to his professional reputation and career.

216.     On this claim for relief, plaintiff seeks all appropriate relief, including rehiring or reinstatement to his former position with restoration of seniority, payment of lost compensation, damages and attorney's fees.

## NINTH CLAIM FOR RELIEF
## AGAINST DEFENDANT COMFORCE

### Civil RICO Claim

217.     The plaintiff repeats each and every allegation previously made here and as if set forth fully herein.

218.     Comforce is an "enterprise" as that term is defined in 18 USC § 1961 (4), which engages in, and whose activities affect, interstate commerce.

219.     Defendants Maccarrone, Fanning and Petix are "persons" as that term is defined in 18 USC § 1961 (3) and are employed by or associated with the said enterprise.

220.    Defendants Maccarrone, Fanning and Petix engaged in a pattern of racketeering activity as defined by 18 USC § 1961 in that they either performed or condoned the following:

a)    Maintaining a pattern and/or practice of entering into telecommunications installation and/or service contracts that required union workers on the projects such as the plaintiff and other similarly situated employees of Comforce;

b)    Arranging for Comforce telecommunications workers, such as the plaintiff and other similarly situated employees of Comforce, to become temporary union members with defendant CWA by entering into a collective bargaining agreement which defendants Maccarrone, Fanning and Petix knew provided no true or meaningful union benefits or rights;

c)    Withheld union dues from the plaintiff and other similarly situated employees of Comforce without a signed authorization as required by state law and the collective bargaining agreement;

d)    Knowingly failing to advise the plaintiff and those similarly situated of their *General Motors* or *Beck* rights;

e)    Knowingly informing the plaintiff and other similarly situated employees of Comforce that their jobs were a "pay to play" system in which, if they want the work, they had to pay union dues while defendants Maccarrone, Fanning and Petix knew that no true or meaningful union representation rights would be provided to the plaintiff and those similarly situated;

f)    Arranging for the union dues to be wired to the accounts of CWA and/or Local 6171 so that temporary union cards could be mailed to the plaintiff and those similarly situated or electronically transferred to a Comforce database while knowing that the plaintiff and other similarly situated employees of Comforce, in fact, would not receive any true or meaningful union representation through collective bargaining or on-site union representation;

g)    Knowingly withholding the collective bargaining agreement, contract books or other documents from the plaintiff and other similarly situated employees of Comforce that, if given to them, would have apprised them of rights as union members as to grievances or other benefits reasonably expected as members of a union;

h)    Knowingly failing to pay prevailing wages, or overtime compensation or required per diem and mileage reimbursements to the plaintiff and other similarly situated employees of Comforce; and

i)      Knowingly using all of the above as a competitive advantage in bidding for contracts.

156.    The above said acts on the part of these defendants constitutes a pattern of extortion chargeable under New York State Penal Law § 155.05 (e) (ix); larceny by false promise chargeable under New York State Penal Law § 155.05(d); scheme to defraud in the first degree chargeable under New York State Penal Law § 190.65; mail fraud chargeable under 18 U.S.C. § 1341; and wire fraud chargeable under 18 U.S.C. § 1343.

157.    The acts of Maccarrone, Fanning and Petix also violate 18 U.S.C. § 1962 (c) in that these defendants were employed by and/or associated with an enterprise with activities that affect interstate commerce and conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

158.    The acts of Defendants Maccarrone, Fanning and Petix constitute a violation of 18 U.S.C. § 1962 (d) in that these defendants conspired with each other to violate 18 U.S.C. § 1962(c).

159.    As a result of the foregoing, the plaintiff and other similarly situated employees of Comforce have been injured in their persons and their property in that they paid union dues under duress and fear of economic harm; paid union dues without receiving any union representation, rights or benefits in exchange for the dues; sustained other loss of earnings in the form of unpaid prevailing wages, unpaid overtime and inadequate per diem and mileage reimbursements.

160.    The plaintiff and other similarly situated employees of Comforce are, therefore, entitled to all damages set forth above and additionally treble damages, punitive damages, costs and expenses of this suit as well as reasonable attorneys' fees.

### TENTH CLAIM FOR RELIEF AGAINST
### DEFENDANTS CWA and LOCAL 6171

### <u>Civil RICO Claim</u>

161.    The plaintiff repeats each and every allegation previously made in this complaint as if set forth fully herein.

162.    Defendants CWA and Local 6171 are an "enterprise" as that term is defined in 18 U.S.C. § 1961 (4), which engages in, and whose activities affect, interstate commerce.

163.    Defendants Bentley, Whittaker, Simmons and James are "persons" as that term is defined in 18 U.S.C. § 1961 (3) and are employed by or associated with the said enterprise.

164.    Defendants Bentley, Whittaker, Simmons and James engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961 in that they either performed or condoned the following:

a)    Entering into a collective bargaining agreement with Comforce with the intention of not providing any true or meaningful representation that the plaintiff and other similarly situated employees of Comforce had the right to expect to receive as members of a union;

b)    Accepting wire transfers of union dues withheld from the plaintiff and those similarly situated knowing there were no signed authorizations to withhold said dues;

c)    Mailing to the plaintiff and those similarly situated or electronically transferring to the database of Comforce temporary union cards in exchange for the union dues while knowing that they were providing no true or meaningful union representation as the plaintiff or other similarly situated employees of Comforce had a right to expect as members of a union;

d)    Knowingly failing to provide a shop steward or other union representative at job locations for which these defendants provided temporary union cards to the plaintiff and other similarly situated employees of Comforce;

e)       Knowingly allowing the plaintiff and other similarly situated employees of Comforce to enter into individual employment contracts with Comforce instead of collectively bargaining for them; and

f)       Benefitting from these acts with increased revenues from membership dues while not having to provide any services in exchange and benefitting from increased membership roles that lead to more power and influence as a union.

165.    The above said acts on the part of these defendants constitutes a pattern of larceny by false promise chargeable under New York State Penal Law § 155.05(d); scheme to defraud in the first degree chargeable under New York State Penal Law § 190.65; mail fraud chargeable under 18 U.S.C. § 1341; and wire fraud chargeable under 18 U.S.C. § 1343.

166.    The acts of defendants Bentley, Whittaker, Simmons and James constitute a violation of 18 U.S.C. § 1962 (c) in that these defendants were employed by and/or associated with an enterprise whose activities affect interstate commerce and conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

167.    The acts of defendants Bentley, Whittaker, Simmons and James constitute a violation of 18 USC § 1962 (d) in that defendants conspired with each other to violate 18 USC § 1962(c).

168.    As a result of the foregoing, the plaintiff and other similarly situated employees of Comforce have been injured in their persons and their property in that they have paid union dues under duress and fear of economic harm; paid union dues with no union and representation, rights or benefits received in exchange for the dues; have sustained other loss of earnings in the form of unpaid prevailing wages, unpaid overtime, and inadequate per diem and mileage reimbursement.  As such, they are entitled to all damages set forth above and additionally treble damages, punitive damages, costs and expenses of this suit as well as reasonable attorneys' fees.

## ELEVENTH CLAIM FOR RELIEF AGAINST
## DEFENDANTS COMFORCE, CWA and LOCAL 6171

### For Conversion

169.    The plaintiff repeats and realleges each and every allegation previously made in this complaint as if set forth fully herein.

170.    The defendant Comforce and its subsidiaries, acting alone or in concert with the CWA or CWA Local 6171, intentionally, willfully and maliciously converted funds owed to plaintiff and other similarly situated employees of Comforce by withholding monies from them on the pretext that said money was to be used to obtain union representation.

171.    At the time of conversion, the plaintiff and other similarly situated employees of Comforce were the owners and rightful possessors of the converted funds.

172.    Upon information and belief, Comforce sometimes wrongfully retained the funds it converted from the plaintiff and other similarly situated employees of Comforce, and sometimes Comforce sent the converted funds to CWA or CWA Local 6171.

173.    At all times relevant hereto, the plaintiff and other similarly situated employees of Comforce had a superior right of possession to the funds which Comforce, CWA or CWA Local 6171 wrongfully converted to further their scheme and common plan.  The plaintiff and other similarly situated employees of Comforce are entitled to immediate possession of the funds wrongfully withheld and converted by said defendants.

174.    At all times relevant hereto, neither the defendant Comforce nor CWA Local 6171 ever provided any benefits or services to the plaintiff or other similarly situated employees of Comforce in exchange for the converted funds.

175.    Plaintiff and other similarly and other similarly situated employees of Comforce demand that Comforce, the CWA and/or CWA Local 6171 return all funds so converted plus

interest.  In addition, the plaintiff and those similarly situated seek to recover the funds that have to expend to recover the converted property as special damages.

176.    Also, because Comforce, the CWA and CWA Local 6171 acted willfully and maliciously and converting funds owed to the plaintiff and other similarly situated employees of Comforce for the express purpose of defrauding legitimate union shops, they are entitled to punitive damages.

**TWELFTH CLAIM FOR RELIEF AGAINST<br>DEFENDANTS COMFORCE, CWA and LOCAL 6171**

**<u>For Fraud</u>**

177.    The plaintiff repeats and realleges each and every allegation previously made in this complaint as if set forth fully herein.

178.    The plaintiff and other similarly situated employees of Comforce were forced to pay union dues while employed by Comforce.  On numerous occasions, the plaintiff and other similarly situated employees of Comforce inquired as to the benefits they would receive by virtue of being members of CWA Local 6171.

179.    Comforce repeatedly and falsely represented that the plaintiff and other similarly situated employees of Comforce had to join the union because it was a "pay to play system," and that they had to pay a fee to work in particular locations.

180.    Comforce further falsely represented that the plaintiffs and other similarly situated employees of Comforce had no union representative, no special rights, and no Collective Bargaining Agreement.  At the time these representations were made, Comforce knew that such statements were false or they were made with reckless disregard as to the truth or falsity thereof.

181.    The materially false representations made by Comforce was intended to deceive the plaintiff and other similarly situated employees of Comforce to prevent them from seeking the assistance of a union representative to remedy illegal compensation plans imposed on them by Comforce.

182.    The plaintiff and other similarly situated employees of Comforce attempted to contact CWA Local 6171 by calling a phone number listed on the CWA union card that Comforce had given them in an effort to determine what, if any, benefits they were entitled to by virtue of their union membership.

183.    The CWA Local 6171 representative who answered such calls stated that any such information was to be provided by Comforce's Human Resource department.

184.    Thus, at the time that Comforce made the false representations described herein, the plaintiff and other similarly situated employees of Comforce were ignorant of the falsity of the representations and believed them to be true.  The ignorance of the plaintiff and other similarly situated employees of Comforce as to the falsity of the representations by Comforce were compounded by the false representations of CWA local 6171.

185.    CWA Local 6171 also made representations to the plaintiff and other similarly situated employees of Comforce that were false, and CWA Local 6171 either knew they were false or made them with reckless disregard to the truth or falsity thereof.  These representations were intended to deceive the plaintiff and those similarly situated from seeking union assistance in any manner.

186.    Because the plaintiff and other similarly situated employees of Comforce had been informed by both Comforce and CWA Local 6171 that the union dues they had been paying

were for a "pay to play" system, they were ignorant as to the falsity of those representations and believed them to be true.

187.    The plaintiff and other similarly situated employees of Comforce relied upon the representations made by the defendants and, as a result, did not object to the money withheld by the defendants and never sought union assistance on other illegal compensation practices of Comforce.

188.    For example, had the defendants not made the aforementioned false representations to plaintiff and those similarly situated, they would have challenged the recurring "bait and switch" tactics of the companies by filing a grievance through their union.  However, because the plaintiff and those similarly situated relied upon the false representations of the defendants to their detriment, monies were improperly withheld from their paychecks and they were prevented from collecting monies owed to them pursuant to a Collective Bargaining Agreement.

189.    But for the false representations made by the defendants, the plaintiff and other similarly situated employees of Comforce would have invoked their union rights to challenge the aforesaid illegal and/or unethical acts of Comforce that deprived them from earning the true sums owed to them.

190.    As a result of these fraudulent misrepresentations, the plaintiff and other similarly situated employees of Comforce sustained damages by way of improperly withheld union dues, improperly withheld salary and per diem and travel reimbursements, and improper constructive termination.

191.    Therefore, plaintiff and other similarly situated employees of Comforce demand damages in the amount of union dues withheld, and all actual and consequential damages naturally flowing from the fraudulent misrepresentations and concealment by the defendants.

192.    Further, because the defendants attempted to deny the plaintiff and those similarly situated of their rights to unionize and collectively bargain for their benefits and working conditions, the fraudulent misrepresentations and concealment was aimed at the public generally and involve a high degree of moral culpability.  As such, punitive damages are warranted.

## DEMAND FOR TRIAL BY JURY

193.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully requests a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, it is respectfully requested that this Court assume jurisdiction herein and thereafter plaintiffs demand a trial by jury and judgment against defendants as follows:

a)    On the First Claim for Relief as against defendant Comforce, an award equal to the union dues withheld from plaintiff and other similarly situated employees of Comforce without written authorization plus liquidated damages equal to 25% of said amount and an award for attorneys fees as provided under New York labor Law § 198, plus interest and costs.

b)    On the First Claim for Relief as against defendant Comforce, punitive damages in light of said defendant's willful and contumacious conduct as alleged.

c)    On the Second Claim for Relief as against defendant Comforce, an award equal to the amount of unpaid overtime wages that said defendant failed to pay to the plaintiff and other similarly situated employees, plus an award of liquidated damages in the amount of 100% of the unpaid overtime, plus attorneys fees, interest and costs as provided for by the FLSA.

d)      On the Third Claim for Relief as against defendant Comforce, an award to plaintiff and other similarly situated employees of Comforce equal to unpaid prevailing wages, plus liquidated damages equal to 25% of said sum and attorneys' fees as provided in New York Labor law §198, plus interest and costs.

e)      On the Third Claim for Relief as against defendant Comforce, an award to plaintiff and other similarly situated employees of Comforce to compensate them for being paid inadequate per diem and mileage reimbursement equal to the difference between what Comforce should have paid the plaintiff and its other similarly situated employees under the law and the amount that Comforce actually paid them, plus attorneys fees, interest and costs.

f)      On the Fourth Claim for Relief as against defendants Comforce, Local 6171 and CWA pursuant to §§ 185 and 187 of the Labor Management Relations Act, the return of all union dues paid to defendants Local 6171 and CWA, the unpaid prevailing wages, compensation for inadequate per diem and mileage reimbursements to the plaintiff and other similarly situated employees of Comforce, plus interest and costs.

g)      On the Fifth Claim for Relief as against defendants CWA and Local 6171, an award to plaintiff and other similarly situated employees of Comforce equal to all paid union dues, unpaid overtime owed by defendant Comforce, and unpaid prevailing wages and per diem and mileage reimbursements for breach of the duty of fair representation, plus interest and costs.

h)      On the Sixth Claim for Relief as against defendants CWA and Local 6171 for their unjust enrichment, an award to plaintiff and other similarly situated employees of Comforce for all union dues withheld from them, together with interest and costs.

i)      On the Seventh Claim for Relief as against defendant Comforce for Labor Law violations, an award to plaintiff reinstating him to his former position with back pay and restoring all benefits including seniority, plus economic damages suffered as a consequence of the illegal termination of his employment and attorneys' fees.

j)      On the Eighth Claim for Relief as against defendant Comforce for wrongful termination of plaintiff's employment, an award reinstating him to his former position with back pay and restoring all benefits including seniority, plus economic damages suffered as a consequence of the illegal termination of his employment and attorneys' fees.

k)      On the Ninth Claim for Relief as against defendant Comforce for Civil RICO violations, all damages sought above plus treble damages, punitive damages, costs and expenses of this suit and reasonable attorneys' fees.

l)      On the Tenth Claim for Relief as against defendants CWA and Local 6171 for Civil RICO violations, the return of all dues paid, plus compensation for loss of earnings in the form of unpaid prevailing wages, unpaid overtime, and inadequate per diem and mileage reimbursement.  In addition, they are entitled to treble damages, punitive damages, costs and expenses of this suit as well as reasonable attorneys' fees.

m)      On the Eleventh Claim for Relief as against defendants Comforce, Local 6171 and CWA for conversion, all damages sought above plus punitive damages, costs and expenses of this suit and reasonable attorneys' fees.

n)      On the Twelfth Claim for Relief as against defendants Comforce, Local 6171 and CWA for fraud, all damages sought above plus punitive damages, costs and expenses of this suit and reasonable attorneys' fees.

o)      Such other and further relief as this Court deems just and proper.

Dated: October 31, 2008                    Yours, etc.,

                                           s/ Frank S. Gattuso_____
                                           Frank S. Gattuso, Esq.
                                           Bar Roll No. 513636
                                           O'HARA, O'CONNELL & CIOTOLI
                                           *Attorneys for the Plaintiffs*
                                           7207 East Genesee Street
                                           Fayetteville, New York 13066
                                           Telephone: (315) 451-3810

## INDIVIDUAL VERIFICATION

State Of New York      )
                       ) ss.:
County of Onondaga  )


ERIC J. ELDRED, JR., being duly sworn, deposes and says that he is the Plaintiff in the within action; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to his own knowledge, except as to the matters therein stated to be alleged on information and belief and that as to those matters deponent believes them to be true.

Dated:  October 29, 2008

_____
ERIC J. ELDRED, JR.


State Of New York      )
                       ) ss.:
County of Onondaga  )


On the 29TH day of October, 2008, before me, the undersigned, a notary public in and for the state, personally appeared ERIC J. ELDRED, JR., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.


_____
NOTARY PUBLIC

My Commission Expires:  6/12/2010

EILEEN M. MALAY
Notary Public, State of New York
Qualified in Cortland County
No. 01MA6043076
Commission Expires June 12, 20 10