**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ERIC J. ELDRED, JR., RICHARD BORDEN,
MATTHEW CAEZZA, BRIAN FRANK, and MARK
MACLAURY on behalf of themselves
and those similarly situated,

                              Plaintiffs,

             -against-

COMFORCE CORP., d/b/a Comforce Telecom, Inc.,
Sumtec Corp., and Prestige-Comforce Professional
Services; JOHN FANNING, individually and in his
capacity as Chairman and Chief Executive Officer of
Comforce Corp.; HARRY MACCARRONE,
individually and in his capacity as Chairman and Chief
Executive Officer of Comforce Telecom, Inc., and
Sumtec Corp.; PETER PETIX, individually and in his
capacity as Vice President and General Manager of
Comforce Telecom, Inc.;

                              Defendants.

**THIRD AMENDED**
**COMPLAINT**

JURY TRIAL DEMANDED

CIVIL CASE NO.: 3:08-cv-01171
LEK – DEP

_____

FLSA COLLECTIVE ACTION

And

CLASS ACTION
_____

## NATURE OF THE CASE

1.     All references herein to "Comforce" in this Third Amended Complaint include not only Comforce Corporation, but also Comforce Telecom, Inc., Sumtec Corp. and Prestige Comforce Professional Services, which upon information and belief were the direct employers of the named plaintiffs and similarly situated class members, and at all relevant times were either a subsidiary and/or operating as a d/b/a of Comforce Corporation (collectively, "Comforce").

2.     The references herein to "plaintiffs," "employees" or "telecommunication installers" refer to all non-exempt Comforce telecommunication installers.

3.     One of the many businesses conducted by Comforce is the installation and/or servicing of telecommunications equipment.

4.     The Plaintiffs were employed by Comforce at different times from the mid-1990s through the present.

5.     Plaintiff Eric Eldred ("Eldred") began his employment with Comforce working as an installer and rose to the level of engineer/supervisor.  Basically, he would receive a call from Comforce regarding an upcoming project and would be required to travel to the job location where he would remain for the duration of the job, except for traveling home periodically if the duration of the job allowed.  Such job location could be anywhere in the United States and, thereafter, he would either return home or continue immediately to another job site.  All the other named plaintiffs had similar experiences and, upon information and belief, so did the similarly situated proposed class members.

6.     During much of the plaintiffs' employment with Comforce, the company deducted union dues from their paychecks.  Comforce never asked the plaintiffs if they wanted to join the union and none of the plaintiffs ever provided Comforce with a written, signed

authorization for dues to be withheld from their paychecks.  The plaintiffs were consistently told that they were only working in a "pay to play" system in which they had to pay union dues to be eligible for the Company to allow them to work in buildings that require union labor.

7.      In situations where Comforce was awarded a contract on a project that required union labor, Comforce, through its officers named as individual defendants herein, would contact Local 6171 of the Communications Workers of America ("CWA") in Krum, Texas and arrange for temporary union cards to be issued for the plaintiffs and others similarly situated Comforce employees.  Interestingly, Comforce had this arrangement with Local 6171 in Texas although there are CWA locals in New York where the plaintiffs and others similarly situated reside.

8.      Specifically, and as hereinafter alleged, Comforce failed to pay the plaintiffs and other similarly situated employees the wages and other monies due them under both federal and state law as required by the Fair Labor Standards Act at 29 U.S.C. § 201, *et. seq.*, 29 CFR §785, *et. seq.*, New York Labor Law Articles 6, 7, and 19, and 12 NYCRR 142-2.2.

9.      The defendants violated state and federal laws in relation to plaintiffs and similarly situated employees by: (a) making unauthorized deductions from their wages contrary to state law; (b) failing to pay required prevailing wages, proper per diems, or travel expenses due them under federal and state law; and (c) failing to pay wages for all work time including travel time from plaintiffs' home community to their out of town work assignments and overtime as required by the Fair Labor Standards Act and New York State labor laws.

10.     Despite paying union dues, the plaintiffs and other similarly situated class members had no union representation to rely on to seek a remedy for these violations because the union never provided representation to the plaintiffs and similarly situated employees, or even informed them that they were entitled to such representation.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §§ 201-219 (FLSA); 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1337 (Acts of Congress regulating Commerce), and supplementary jurisdiction under 28 U.S.C. § 1367 (State Claims).

12.    The Court has personal jurisdiction over the defendants pursuant to 28 U.S.C. § 1391(b) & (c).

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c).

## PARTIES TO THIS ACTION

_The Named and Class Plaintiffs_

14.    At all times materially relevant to this Complaint, Eric Eldred has resided in Norwich, New York within the Northern District of New York.

15.    At all times materially relevant to this Complaint, Richard Borden has resided in Norwich, New York within the Northern District of New York.

16.    At all times materially relevant to this Complaint, Matthew Caezza has resided in Norwich, New York within the Northern District of New York.

17.    At all times materially relevant to this Complaint, Brian Frank has resided in Otego, New York within the Northern District of New York.

18.    At all times materially relevant to this Complaint, Mark MacLaury has resided in McDonough, New York within the Northern District of New York.

19.    The named plaintiffs all began working for Comforce and/or one of its wholly-owned subsidiaries in the mid 1990s as installers or supervisor installers of telecommunications equipment.  Sometime after the commencement of their employment with Comforce, they were

entered into the CWA union by Comforce through the CWA's Local 6171 affiliate in Krum, Texas. Some installation or servicing jobs required union dues to be withheld and others did not.

20.    Plaintiffs' claims for relief are against Comforce and its individual officers, Fanning, Maccarrone and Petix, for their violation of wage and overtime requirements of the Fair Labor Standards Act ("FLSA") at 29 U.S.C. §§ 203, 206, 207, & 216 and 29 C.F.R. §§ 785.39 and 785.50 (First Claim); violation of New York Labor Law §§ 190, 193, 198 for the unauthorized withholding of wages (Second Claim); violation of the minimum wage and overtime wage requirements of New York Labor Law §§ 190, 193, 198 652, 655, 663 and 12 NYCRR § 142-2.2 (Third Claim); violation of the wage and overtime requirements pertaining to prevailing wages, per diem, and mileage reimbursement of New York Labor Law §§ 190, 193, 198, 652, 655, 663, and 200 *et. seq.* (Fourth Claim); and for conversion under New York common law (Fifth Claim).

21.    "FLSA Class I" - The proper similarly situated class of individuals for the First Claim for Relief under the FLSA are all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers and who were not paid regular and/or overtime compensation for travel time that kept them away from home overnight, the travel occurred during the hours of the day that they normally worked, and such travel was clearly compensable work time under the FLSA, in particular 29 CFR 785.39.

22.    Upon information and belief, the FLSA Class I individuals asserting the First Claim consists of not less than 187 persons and may be as high as 1,000 persons and all class members should be able to make claims for the First Claim. Thus, collective action under FLSA § 216(b) is appropriate.

23. "Class II" - The proper similarly situated class of individuals for the Second, Third and Fourth Claims under New York State Labor Law are all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers and whose history of compensation from Comforce qualifies them for inclusion in subclass "A", and/or subclass "B", and/or subclass "C" as described below:

a) "CLASS II-A" – SECOND CLAIM.  This subclass includes the named plaintiffs and similarly situated employees who had wages withheld from their pay checks for union dues without having provided a signed authorization for Comforce to withhold wages in violation of New York Labor Law.

b) "CLASS II-B"– THIRD CLAIM.  This subclass includes the named plaintiffs and similarly situated employees who were not paid wages for all hours worked, including hours spent traveling, that are deemed work hours pursuant to 29 C.F.R. 785.39 and compensable under New York Labor Law,  and/or were not paid overtime for all hours worked in excess of 40 hours per week as required by New York Labor Law.

c) "CLASS II-C" – FOURTH CLAIM.  This subclass includes the named plaintiffs and similarly situated employees who worked for Comforce on projects that were publically funded and did not receive prevailing wages, prevailing per diem, or prevailing mileage reimbursement as required by New York State Law.

24. Upon information and belief, Class II persons consist of not less than 187 persons and very well may exceed 1,000.  Further, upon information and belief, each subclass is comprised of a majority of this class' total members where similarly situated employees may be members of every subclass.  Said class is so numerous that joinder of all members is impracticable under the standards of Federal Rule of Civil Procedure § 23 (a) (1).

25. The proper similarly situated class of individuals for the Fifth Claim for Relief, "Class III", is all persons who at times relevant hereto were employed by Comforce as non-exempt telecommunications installers *and* were members of CWA who,

a) Paid union dues;

b)      Had union membership cards issued in their name;

c)      Were employed by Comforce; and

d)      Received no true or meaningful representation with respect to the economic harm set forth in the First and Second Claims for Relief in exchange for the union dues withheld from their paychecks.

26.     There are questions of law and fact common to each of the above-described classes and subclasses that predominate over any question that affects only individual members. Only the amount of individual damages sustained by each class member will vary.

27.     The claims of the named plaintiffs are typical of the claims of each of the above-described classes in that all of the members of each class have been similarly affected by the acts and practices of the defendants.

28.     The named plaintiffs will fairly and adequately protect the interest of the members of each of the above-described classes, and their interests are not adverse to the interests of the other members of either class.

29.     While collective action for the FLSA Class I is appropriate under FLSA § 216(b), class action for the remaining classes and subclasses is equally appropriate and is superior to other available methods for the fair and efficient adjudication of the controversy under the standards of Federal Rule of Civil Procedure § 23 (b)(3).

*The Comforce Corporate Defendants*

30.     Comforce is a professional staffing company headquartered at 415 Crossways Park Drive, Woodbury, New York, 11797. It has numerous subsidiaries including, but not limited to, Comforce Telecom, Inc.; and Sumtec Corporation that are all also located at 415 Crossways Park Drive, Woodbury, New York, 11797. Another Comforce subsidiary, Prestige-Comforce Professional Services ("PCPS"), is located at 801 North Jupiter Road, Suite 102,

Plano, Texas, 75074 and is a d/b/a of Comforce Telecom, Inc. All references to "Comforce" in this Complaint shall include all subsidiaries and any company operating under a d/b/a filed by Comforce and named herein.

### *The Comforce Individual Defendants*

31.    Defendant John Fanning ("Fanning") is the Chairman and/or Chief Executive Officer of Comforce's parent corporation, Comforce Corp.

32.    Upon information and belief, as Chairman and Chief Executive officer, Fanning was responsible for overseeing the day-to-day activities of the Comforce entities, for entering into contracts with customers for the installation and/or servicing of telecommunication equipment, and for the negotiation, execution, and/or administration of collective bargaining agreements between Comforce and recognized unions. Also, defendant Fanning's name appears on the change to the Comforce travel pay policy promulgated in 2004, which established a maximum of four hours compensable time for travel. A copy of the 2004 travel policy as attached hereto as **Exhibit "1"**.

33.    Upon information and belief, defendant Harry Maccarrone ("Maccarrone") is the Chairman and/or Chief Executive Officer of at least three principle subsidiaries of Comforce, (i.e., Comforce Telecom, Inc., Comforce Technical Services, Inc., and Sumtec Corporation). All three companies are headquartered at 415 Crossways Park Drive, Woodbury, New York, 11797.

34.    Upon information and belief, as Chairman and Chief Executive Officer, Maccarrone was responsible for these entities entering into contracts with customers for the installation, maintenance, and/or repair of telecommunication equipment and for the negotiation, execution, and/or administration of collective bargaining agreements between Comforce and recognized unions.

35.     Defendant Peter Petix ("Petix") is the Vice President and General Manager of Comforce Telecom, Inc. Upon information and belief, Petix reports directly to Maccarrone and Fanning and directly supervised the plaintiffs and similarly situated employees.

36.     Upon information and belief, Petix's office is located at 20 Crossways Park Drive North, Suite 200, Woodbury, New York 11797.

37.     Upon information and belief, Petix signed the collective bargaining agreements with the CWA on behalf of Comforce with the knowledge, approval, and permission of the Maccarrone and Fanning.

38.     Upon information and belief, Petix was also directly involved with employment related issues involving Comforce's telecommunication contracts, including the individual employment agreements that Comforce entered into with the plaintiffs and other similarly situated persons.

39.     Upon information and belief, Petix was also responsible, on behalf of Comforce, Maccarrone, and Fanning, for the negotiation and administration of collective bargaining agreements between Comforce and recognized unions, including the CWA.

40.     On numerous occasions, Petix spoke directly to Eldred about matters related to his employment by Comforce, including his rate of pay, per diem, hours of pay, overtime, union status and job assignments.

**FACTUAL BASIS FOR CLAIMS**

**Nature of Working Relationship Between the Plaintiffs and Comforce**

41.     Comforce engages in interstate commerce in the business of obtaining contracts and providing workers to engineer, furnish, and install telecommunications equipment in commercial buildings around the country.

42.     The plaintiffs were hired by Comforce in the mid-1990s as telecommunications installers or supervisor installers.  The jobs on which the plaintiffs and those similarly situated worked for Comforce were not located in their hometown.  Rather, the job locations were situated around the country.  This fact required them to travel to the work site and remain there for several days, weeks or months until the installation was completed, except for travelling home periodically if the duration of the job allowed.

43.     In addition to an hourly rate of pay, the plaintiffs and those similarly situated were to receive a per diem rate for lodging, travel to and from their motels to the workplace, meals, mileage and laundry.  The actual per diem rate depended on the location of the city where the job was located.

44.     There are published Federal and New York State per diem and prevailing wage rate guidelines which, under some circumstances, govern those rates depending upon the nature and location of the contract work being performed.

45.     Upon information and belief, in addition to the Federal and New York State guidelines, Comforce would consider the contract with the vendor for each job when determining how much compensation they would offer the plaintiffs and other similarly situated employees.

46.     The custom and practice was for Comforce to obtain telecommunication installation contracts and then offer the work to its installers at the rate of pay set forth in

previously negotiated employment contracts with the installer together with a specific per diem rate for that particular job. Installers would have the option of accepting the work or declining and waiting for the next opportunity for more work. The plaintiffs and those similarly situated rarely, if ever, declined an offer of work from Comforce.

47. Some of the Comforce projects required that Comforce use workers who were union members (a "union job"), and some did not. If the project was a union job, Comforce would arrange for the plaintiffs and similarly situated persons to be issued temporary union cards from the CWA through Local 6171 in Krum, Texas.

48. Sometimes, the plaintiffs and similarly situated persons would receive a union card by US mail or Federal Express at the job site. More often, the plaintiffs and similarly situated persons would be informed that the union card had been issued electronically and that if anyone on the job site asked to see it, they should contact the project manager who would address the issue with the inquiring employee.

49. On several Comforce jobs, the plaintiffs and similarly situated persons did not know whether they were working on a union job or a non-union job until they received their paychecks and saw that union dues had been withheld from their pay.

50. Further shrouding the entitlement and status of plaintiffs and similarly situated employees, Comforce had a standing work place rule that prohibited all employees from speaking with anyone, including another Comforce employee or any other person at the job site, about their pay rates, per diem reimbursement, or union status. If an employee violated this rule, he or she would be immediately dismissed from the job site and replaced. In those circumstances, it would often be months as opposed to weeks before such employee would receive a phone call from Comforce for their next job assignment.

## The Comforce – CWA Relationship

51.    During the course of their employment with Comforce or its subsidiaries, the plaintiffs and those similarly situated were members of the CWA union, Local 6171 ("Local 6171"). Some jobs required union dues to be withheld and others did not. A copy of the Collective Bargaining Agreement ("CBA") between Comforce and the CWA is attached hereto as **Exhibit "2."**

52.    Upon information and belief, at all times relevant hereto, Local 6171 had a collective bargaining agreement with Comforce that governed the relationship, duties and responsibilities of the CWA, Comforce and the member employees. (*See* Exhibit "2").

53.    Exhibit "2" includes an authorization for the deduction of union dues from the members' pay. However, neither the plaintiffs, nor those similarly situated ever signed such an authorization while working for Comforce. Even upon request, Comforce refused to provide a copy of the collective bargaining agreement to Eldred. He did not receive a copy of the collective bargaining agreement until February 23, 2006, when one was provided to him by Donna Bentley from the CWA District Office in connection with plaintiff Eldred's unemployment hearing.

54.    Although Comforce had a continuing employment relationship with the plaintiffs and other similarly situated installers that extended from job to job, the CWA was purportedly involved only when Comforce had been awarded work on a union job that required Comforce to employ union workers. Upon information and belief, many of the jobs on which the plaintiffs and those similarly situated worked for Comforce were union jobs regardless of whether they were public projects.

55.    When the work to be performed by Comforce required that it supply union workers, it would essentially use the same groups of employees, including the plaintiffs and those similarly situated, that it used on all jobs.  The only difference is that Comforce would cause Local 6171 to issue union cards for these employees for the duration of that particular job.

56.    The plaintiffs and most coworkers lived in the northeast and there were CWA locals throughout the northeast.  Nevertheless, Comforce had the plaintiffs and those similarly situated employees admitted to Local 6171 located in Krum, Texas.

57.    Local 6171 is situated approximately 40 miles from the headquarters of Prestige Comforce Professional Services ("PCPS") in Plano, Texas.  PCPS was frequently listed as the "pay group" on the plaintiffs' paychecks for work they performed on union jobs throughout the course of their employment by Comforce.  Upon information and belief, other similarly situated Comforce employees also received PCPS paychecks.

## No Union Representation Provided

58.    The plaintiffs and those similarly situated never had any direct contact with any Local 6171 representative or any other CWA representative at the job site at any time during the years they worked for Comforce.

59.    The plaintiffs and those similarly situated Comforce employees were not provided with a copy of the CWA collective bargaining agreement, until Eldred's repeated demands for the contract resulted in Bentley providing him one on February 23, 2006.  Upon information and belief, Eldred is the only member of the class to ever receive a copy of the CBA.

60.    Moreover, the plaintiffs and those similarly situated Comforce employees never received any information from either CWA or Comforce regarding their rights and responsibilities as union members, never had a shop steward or other union representative at a

job location, never received any information regarding a formal grievance process, and were never provided any information on how to contact a union representative.

61.     In response to requests for information as to their union status and rights, the plaintiffs and those similarly situated Comforce employees were told by Comforce that they had no collective bargaining agreement, no union representation, and no special rights or privileges.

62.     According to Comforce, the payment of union dues was allegedly required because of the "pay to play" system, wherein the plaintiffs and similarly situated had to pay money to work in a union building.  In fact, Mark MacLaury was told, "You're in a union, but you're not in a union."

63.      In fact, when Eldred received actual union cards early in his years with Comforce, of the several times he attempted to contact the union through the toll-free number shown on the union card, a receptionist would answer the call and then direct him to contact Comforce's Human Resources department to discuss any employment related issue.

64.     The plaintiffs and other similarly situated Comforce employees were specifically instructed never to discuss the union at a job location among themselves or with other trades.  If the did, they would be sent home and replaced.

65.     At one point during Eldred's employment with Comforce, he did inquire about the union and Comforce did not assign him to another project for over three months.

66.     On other occasions, when Comforce failed to pay Eldred the agreed upon per diem rate, he attempted to contact the Comforce Human Resources department as he had been instructed.  They never advised him to contact a union representative or informed him of any of his rights.   Instead, they referred him back to the project manager for the particular job to negotiate his per diem rate.

## Wages Withheld Without Authorization

67.    Upon information and belief, the plaintiffs never gave Comforce an authorization for union dues to be withheld from their paychecks as required by New York Labor Law § 193 or other applicable state law.

68.    Upon information and belief, other similarly situated Comforce employees did not sign the authorization found in **Exhibit "2"** or any other wage deduction authorization form.

69.    Upon information and belief, the practice followed by Comforce of not having wage deduction authorization forms signed by its employees applies to the plaintiffs named herein and all similarly situated employees.

## Circumstances Leading to the Eldred's Separation From Comforce

70.    On several occasions throughout the period that Eldred worked for Comforce or its subsidiaries, the per diem reimbursement rate that was offered to him when he accepted a specific assignment was unilaterally reduced by Comforce after he had arrived at the job site.

71.    Upon information and belief, this same tactic was followed by Comforce with respect to the other named plaintiffs and similarly situated Comforce employees during the years they were employed by Comforce.  The last time Eldred encountered this bait and switch tactic was in October and November of 2005.  The attempt by Comforce to unilaterally reduce the per diem rate began a series of events that ended with Eldred's separation of employment from Comforce.

72.    In October 2005, Eldred received an offer from Comforce to work on an installation job in Philadelphia, Pennsylvania at the $27.50 per hour rate of pay that he had personally negotiated with Comforce plus a per diem reimbursement rate of $120 per day. Eldred accepted the job and began preparing to leave for Philadelphia.

73.     Eldred's preparations for that assignment included driving over an hour away with another Comforce employee to pick up the rental vehicle they would be using, making his hotel arrangements for Philadelphia, and coordinating with the other Comforce employees for the first day on the job.

74.     On the day he was scheduled to travel to Philadelphia, he received a call from Comforce informing him that the per diem rate would, in fact, be either $90.00 or $95.00 per day.  Eldred responded that a per diem rate in that range was unacceptable based on the high cost of hotels and other living expenses in Philadelphia and that he would have to decline the job. Comforce then asked Eldred to give them a day to rectify the problem and to travel to Philadelphia and start the job, with assurances that the per diem would be "fixed."  Relying on Comforce's representations, Eldred did indeed travel to Philadelphia with the expectation that the per diem rate would be the $120 per day he had originally been offered.

75.     After Eldred had already rented a car in Binghamton, New York and was preparing to travel to Philadelphia, Comforce telephoned Matthew Caezza and Eldred listened in on the call.  During the call, Comforce explained that the per diem rate was still an issue and asked that it have until the end of the day to continue to work on it, knowing that Eldred would already be in Philadelphia having completed the first day of work.  Eldred agreed and traveled to Philadelphia with the expectation that the rate would be the $120 as initially promised.

76.     However at the end of day, Comforce called Eldred in Philadelphia and told him that the per diem rate would remain at either $90.00 or $95.00.  In response, Eldred explained to Comforce that he could not accept work at that rate because he could not afford the hotel room and he would have to pay out of his pocket to stay in Philadelphia.  The reply by Comforce was, "… *do what you have to do*," after which Eldred returned to Norwich, New York, leaving behind

three other Comforce employees who, although not happy with the fact that their per diem rate had been unilaterally lowered, decided that they needed the work and would remain at the job site.

77.     Plaintiff Matthew Caezza was also on the Philadelphia job. Although Comforce ultimately paid him the $120/day per diem, it was only after Eldred left and went home. Moreover, in exchange for that per diem Comforce required Caezza and the other installers to complete the job in far fewer hours than they originally planned for and budgeted. The purpose for the reduction in the budgeted labor hours was to offset the added per diem expense so that Comforce's budget and, most important, its profits would not diminish.

78.     Thereafter, Eldred waited several weeks for additional work assignments from Comforce. After failing to receive any contact from them with regard to a future job, Eldred inquired of Comforce directly as to whether his employment had been terminated. He was informed that it had not; that work was just "slow."

79.     Despite this response, no work was ever offered to Eldred again by Comforce. It was the custom and practice of Eldred, the other named plaintiffs, and all other similarly situated installers employed by Comforce to apply for unemployment benefits in between jobs. After the Philadelphia job, Eldred applied for and received unemployment benefits in New York.

### Prevailing Wages, Per Diem, and Mileage Reimbursement

80.     Eldred learned through a June 30, 2008 email from CWA representative, Donna Bentley, that he and other similarly situated Comforce employees should have been paid (a) prevailing wages, (b) appropriate per diems, (c) for hours traveled to and from jobs, and (d) mileage reimbursement on most, if not all, Comforce jobs. Specifically, the email states, *"[m]ost of the jobs undertaken by Sumtec [a Comforce subsidiary] were federal or government*

*type jobs in different locations.  My understanding was that wages would be paid at the prevailing wage rates for each location and that would be in the employees' best interest."*  This email communication is attached hereto as **Exhibit "3."**

81.    Eldred's pay rate from August 2005 through his final job in November 2005 was $27.50 per hour as a field service engineer and/or supervisor installer.  Upon information and belief, Eldred, the other named plaintiffs and other similarly situated Comforce employees never had their compensation adjusted to account for any required prevailing wages, prevailing per diem, for time traveling to and from work sites, or the mileage reimbursement they were owed on many, if not all, of the projects on which they worked for Comforce.

## Comforce Failure to Pay Overtime Rates

82.    In addition to the foregoing, Comforce failed to pay the plaintiffs and other similarly situated Comforce employees statutorily required overtime pay for their undocumented hours and travel time hours that caused their work week to exceed 40 hours per week.

83.    The plaintiffs and other similarly situated Comforce employees were required to travel to different cities throughout the United States to work on jobs for Comforce.  The travel time to and from the different cities ranged from just a few hours to over 20 hours, depending on the distance of the city and the mode of transportation.

84.    From the beginning of their employment with Comforce in the mid-1990s until sometime in 2002, it was Comforce's practice and custom to compensate the plaintiffs for all of their actual travel time and expenses.

85.    However, at some point in 2002 Comforce began verbally informing the plaintiffs and other similarly situated Comforce employees on a job by job basis that they would no longer be paid for any travel time.  The plaintiffs and those similarly situated were not paid for _any_

travel time between that date and sometime in 2004, at which time a new policy was promulgated in writing by defendant John Fanning that provided for travel time pay up to a maximum of only *four* hours of travel time, regardless of the total time actually required for travel to and from the work site.   A copy of that policy is attached as **Exhibit "1"** [Titled "Prestige Comforce Professional Services Travel and Per Diem Policy, rev. 2/04"]. Although issued from PCPS, the travel policy in Exhibit "1" was enforced for all Comforce employees.

86.     The plaintiffs and other similarly situated Comforce employees complained to Comforce supervisors that they were often required to travel over four hours to and from the destinations they had been assigned by Comforce.

87.     Exhibit "1" states on page one that travel time will be paid at the employees' current rate of pay for a *maximum* of four hours.   In other words, the plaintiffs and other similarly situated Comforce employees were not paid for any travel time that exceeded four hours under any circumstances, nor were they paid overtime rates if the combination of their travel work hours and other work hours exceeded forty hours in a week.

88.     This travel time policy is null and void as plaintiffs and other similarly situated Comforce employees should have been paid for travel time that exceeded four hours.  Also, they should have been paid at the statutory overtime rate of time and a half when applicable under the FLSA, Federal Law, and New York State law.

89.     Furthermore, attached hereto as **Exhibit "4,"** is a copy of an employment agreement between plaintiff Eldred and Comforce dated March 2, 2003, which upon information and belief is typical of employment agreements that may have been executed between the class plaintiffs and Comforce.   The agreement addresses many terms of employment, such as

compensation, overtime, reporting dates, and other terms. However, the agreement is silent on pay for travel time and normal work hours.

<u>**Prior Testimony Relevant to Class Claims**</u>

90.    Peter Petix is the Senior Vice President and General Manager of Comforce. During the Eldred unemployment appeals hearings, he admitted to the following facts:

    a.   Comforce or its subsidiaries required employees with union cards for certain job locations;

    b.   the employee would receive a union card but neither Comforce, nor its subsidiaries, would send a copy of a collective bargaining agreement to the employees on union jobs;

    c.   he did not know if employees had their rights as union members and/or rights pursuant to the collective bargaining agreement explained to them;

    d.   it was up to the "recruiter" to explain such matters to the employees, and the "recruiters," in fact, reported to him;

    e.   deductions were taken from the pay of employees when they worked in union buildings;

    f.   he was not familiar with the term "shop steward;"

    g.   if an employee notified Comforce of a grievance, Comforce would have referred that employee to a union representative;

    h.   he would have referred the employee to Donna Bentley at the national union office;

    i.   there were no union representatives on the job sites; and

    j.   union cards for a specific job location were mailed within 24 hours of the request to supervisor for the job location.

91.    Testimony was also taken from the CWA Local 6171 President, Alan Whittaker. Whitaker made the following admissions during his testimony:

    a.   Eldred was a member of the union in 2002 with connection to a Comforce subsidiary known as Sumtec;

    b.   Eldred was in the union by job assignment as needed;

    c.   no shop steward or other union representative was assigned to Eldred's group while he was working with Sumtec;

    d.   he would issue union cards in three month increments and would issue a new card at the end of the three-month period if necessary;

    e.   Eldred, and other similarly situated Comforce employees, would only learn of their rights and responsibilities as union members through "contract books" that were issued to the employer for delivery to the employees in situations where temporary union cards were issued;

    f.   the "contract books" outline a grievance process, but he did not know if that process was communicated to Eldred; and

    g.   he had no record of Eldred being a union member by working for Comforce subsidiary PCPS in Philadelphia in 2005, or at any other time in 2005, despite union dues being withheld from Eldred's paychecks for the PCPS job in Philadelphia.

92.    Further relevant testimony was taken from Kelly Hanks, the Human Resources employee who represented Comforce in Eldred's unemployment appeal hearing process.  She testified that Eldred spoke to her while he was employed by Comforce and that he was looking for help with his per diem issues.  Ms. Hanks also testified that union dues were, in fact, withheld from Eldred's pay checks; but that she knew nothing about the union or that it even existed.

93.    There was also testimony from a Comforce project manager, John Trailor, who admitted that the per diem rate for Eldred and those similarly situated may have been governed by different laws.  He also testified that the rate actually paid by Comforce was based on the contractual agreements with the vendors.

94.    The transcripts of the testimony cited above are attached hereto as **Exhibit "5."**

### Facts Specific To Richard Borden

95.    Richard Borden ("Borden") began working for Comforce through its Sumtec subsidiary in approximately 1994.  At that time, he was hired by James Caruso who Borden

recalls actually worked for a company called Alcatel. Borden reported to an office in Connecticut that, upon information and belief, was an Alcatel office.

96. Borden was hired as an installation supervisor, but was actually a "working" installation supervisor. During his initial time with Comforce, Borden supervised a crew of 20 to 40 installers out of Connecticut, but they in fact worked on projects across the United States.

97. Borden is the supervisor who initially hired Eldred. Borden does not recall actually meeting anyone from Comforce any time during his initial years working for that company. Rather, he reported to James Caruso regarding any issues that needed the input of someone higher up the chain of supervision.

98. When he was hired, Borden recalls being told by Mr. Caruso that he had to join a union to work on the projects because they were in union buildings. He further recalls being informed that there would be no shop steward, no union meetings and no union representatives.

99. These statements by Mr. Caruso struck Borden as odd because he was, in fact, a retired Communications Workers of America union member as of 1992 and he did not understand how he could be a member of a union without the union representation that he had become accustomed to in the past as a member of the CWA.

100. Regardless, upon information and belief, Borden had union dues withheld from his Sumtec pay checks on a regular ongoing basis. However, he never received a union card during his years with Comforce and was, therefore, unaware of exactly what union he was paying dues into. Only recently, did he learn that during his time with Comforce he was actually a member of the Communication Workers of America once again.

101. At some point during Borden's employment by time Comforce, his paycheck began coming from PCPS. He recalls that PCPS was paying his wages in 2004 when he finally

left Comforce.    His decision to finally leave Comforce in 2004 was based primarily on

Comforce's failure to pay his regular time or overtime for travel hours or travel hours that

exceeded four hours.    Since Mr. Borden had no union card or other way to contact any union

representative, he was unable to challenge Comforce's failure to properly pay for travel time and

overtime.

## FIRST CLAIM FOR RELIEF
### (Unpaid Wages and Overtime Under the FLSA)

102.    The plaintiffs repeat and reallege each and every allegation previously made in

this Complaint as if set forth fully herein.

103.    The plaintiffs and other similarly situated employees of Comforce bring this first

claim for relief pursuant to 29 U.S.C. §§ 203(d), 216 (b) and 29 C.F.R. § 785, *et seq*.    Upon

information and belief, there are numerous such similarly situated persons.

104.    Pursuant to the applicable provisions of the FLSA at 29 U.S.C. §§ 206 and 207

and 29 C.F.R. § 785.39, plaintiffs and other similarly situated Comforce employees are entitled

to compensation for time spent traveling away from their home community to Comforce work

sites where such jobs include an overnight stay away from home.

105.    Pursuant to the applicable provisions of the FLSA at 29 U.S.C. §§ 203, 206, 207

and 216 and the wage orders issued at 29 CFR§ 785.39 pursuant to the FLSA, the plaintiffs and

other similarly situated Comforce employees were entitled to be paid (a) for all work time hours,

including travel time, and (b) at the overtime hourly rate of time and one-half their regular hourly

wage for all hours worked in excess of 40 hours per week.

106.    Specifically, 29 CFR§ 785.39 provides that time spent traveling away from an

employee's home city for a job with an overnight stay is work time, not travel time, and is

compensable at the employee's regular rate of pay or at the overtime rate of time and one-half if those hours brought the total of all work hours to more than 40 hours.

107.    The plaintiffs and other similarly situated Comforce employees frequently worked more than 40 hours per week when they were required to travel to and from a Comforce job location.  Comforce willfully failed to compensate the plaintiffs and other similarly situated Comforce employees at the required overtime rate even when their actual travel hours combined with other work hours exceeded 40 hours for the week.

108.    Plaintiffs and other similarly situated Comforce employees frequently were required to travel more than four hours a day to reach the assigned Comforce job location.  However, they were informed, either directly by the individual defendants or by a Comforce supervisor with the knowledge and consent of the individual defendants, that their time sheets would be rejected if they reported more than four hours of travel time.  In such circumstances, an employee would be forced to fill out a new time sheet that reported no more than four hours travel time if he wanted to be paid for that week.

109.    In addition, the time sheets of Comforce employees were sometimes rejected if they reported more than forty hours per week of work.  In such circumstances, an employee would be forced to fill out a new time sheet reflecting less than forty hours if he wanted to be paid for that week.

110.    On this claim for relief, the plaintiffs and other similarly situated employees of Comforce seek a judgment for unpaid wages and unpaid overtime wages in an amount to be determined by an accounting of the hours actually worked and the wages actually paid to the plaintiffs and other similarly situated employees of Comforce.  The plaintiffs also seek an award

of liquidated damages in the amount of 100% of the unpaid wages and overtime, plus attorneys' fees, interest and costs as provided for by the FLSA.

## SECOND CLAIM FOR RELIEF
### (Unauthorized Withholding Of Wages Under New York Law)

111.   The plaintiffs repeat and reallege each and every allegation previously made in this Complaint as if set forth fully herein.

112.   Defendants Comforce, Fanning, Maccarone and Petix are employers of the plaintiffs and similarly situated individuals as that term is defined under § 190(3) of the New York Labor Law.  Accordingly, they are each jointly and severally liable to the plaintiffs for violations of New York Labor Laws.

113.   The plaintiffs and other similarly situated employees of Comforce had money improperly deducted from their pay, through the actions of defendants Fanning, Maccarone and Petix, without having given Comforce signed authorizations to do so as required under § 193 of the New York Labor Law.

114.   The act of making unauthorized deductions from the paychecks of the plaintiffs and other similarly situated Comforce employees violates §§ 193 and 198 of the New York Labor Law.

115.   As a result of the foregoing, the plaintiffs and other similarly situated Comforce employees have been damaged in an amount to be determined at trial by an accounting of the union dues improperly withheld from the wages of the plaintiffs and other similarly situated Comforce employees.  The plaintiffs and other similarly situated Comforce employees also seek damages for mental anguish and emotional distress in an amount to be determined at trial.

116.   On this claim for relief, the plaintiffs and those similarly situated employees expressly waive any award of liquidated damages under New York Labor Law § 198.

## THIRD CLAIM FOR RELIEF
### (Unpaid Wages and Overtime Under New York Law)

117.    The plaintiffs repeat and reallege each and every allegation previously made in this Complaint here and as if set forth fully herein.

118.    Defendants Comforce, Fanning, Maccarrone and Petix are "employers" of the plaintiffs and other similarly situated individuals as that term is defined under § 190(3) of the New York Labor Law.  Accordingly, each of these defendants is jointly and severally liable to the plaintiffs and other similarly situated employees of Comforce.

119.    Pursuant to New York Labor Law §§ 652, 655 and 12 NYCRR 142-2.2 (2004), wages and hours under New York law are defined in accordance with the statutory definitions contained within the FLSA § 201, *et. seq.* (and by implication, 29 C.F.R. § 785.39).

120.    Pursuant to federal law at 29 U.S.C. §§ 203, 206 and  207, and the Department of Labor's wage orders issued at 29 CFR § 785.39, as well as New York Labor Law § 652 and 12 NYCRR 142-2.2, the plaintiffs and other similarly situated employees of Comforce were entitled to (a) be paid for *all* hours worked for defendant Comforce; (b) be paid at the overtime hourly wage rate of time and one half their regular hourly rate for *all* hours worked in excess of 40 hours per week; and (c) be paid for *all* compensable travel time to and from work sites away from their home communities.

121.    On information and belief, plaintiffs and other similarly situated employees of Comforce frequently worked more than 40 hours per week.  However, they were informed, either directly by the individual defendants or by a Comforce supervisor with the knowledge and consent of the individual defendants, that their time sheets would be rejected if they reported more than 40 hours per week for the week.  In such circumstances, an employee would be forced

to fill out a new time sheet that reported no more than 40 hours if he wanted to be paid for that week.

122.    The plaintiffs and other similarly situated employees of Comforce frequently worked more than 40 hours per week when they were required to travel to and from a Comforce job location.  Comforce willfully failed to pay for regular hours worked, for any travel hours that exceeded four hours, or for overtime payments even if the actual travel hours caused the total hours worked for the week to exceed 40 hours.

123.    The plaintiffs and other similarly situated employees of Comforce were informed, either directly by the individual defendants or by a Comforce supervisor with the knowledge and consent of the individual defendants, that their time sheets would be rejected if they reported more than four hours of travel time.  Furthermore, employee time sheets were sometimes rejected if they reported more than four hours of travel time and the employee would be forced to fill out a new time sheet that reported no more than four hours of travel time if he wanted to be paid.

124.    The defendants' aforesaid actions violate New York Labor law §§ 198, 652, 655 and 663 and 12 NYCRR 142-2.2, for which they are liable to the plaintiffs and other similarly situated employees of Comforce.

125.    On this claim for relief, the plaintiffs seek a judgment for unpaid wages and unpaid overtime wages in an amount to be determined based by an accounting of the hours actually worked and wages actually paid to the plaintiffs and other similarly situated employees of Comforce.   The plaintiffs and other similarly situated employees of Comforce also seek damages for mental anguish and emotional distress in an amount to be determined at trial.

126.    On this claim for relief, the plaintiffs and those similarly situated employees expressly waive any award of liquidated damages under New York Labor Law § 198.

## FOURTH CLAIM FOR RELIEF
### (Third-Party Beneficiary and Unjust Enrichment Claims)

127.    The plaintiffs repeat and reallege each and every allegation previously made in this Complaint here and as if set forth fully herein.

128.    Comforce entered into contracts to provide telecommunication installation and/or servicing on projects that were at least partly funded by public money governed by New York State law.  The plaintiffs and other similarly situated employees of Comforce provided the labor for these telecommunication installation service and/or maintenance contracts.

129.    Upon information and belief, when Comforce entered into the aforesaid contracts, it became obligated as a provision of the contracts and/or as a matter of law and public policy to provide certain levels of compensation, including paying the plaintiffs and other similarly situated employees of Comforce prevailing wages, per diems, and mileage reimbursement.

130.    Where Comforce entered into the aforementioned contracts requiring the payment of certain levels of compensation including prevailing wages, per diems, and mileage reimbursement, the plaintiffs and other similarly situated employees of Comforce were third-party beneficiaries of those contracts.  In addition, Comforce was unjustly enriched by failing to pay the agreed to compensation.

131.    Comforce breached these contracts in violation of State law by failing to pay the plaintiffs and those similarly situated the prevailing wages, per diems and mileage reimbursement required under the contracts and/or promulgated by the New York State Department of Labor.

132.    On this claim for relief, the plaintiffs and other similarly situated employees of Comforce, as third-party beneficiaries, seek judgment under New York law for damages caused by Comforce's breach of contract (except where those claims are based on federal funds and pre-empted by the Davis-Bacon Act).  Said damages include compensation for unpaid prevailing wages, per diems, and mileage reimbursement as determined by an accounting of the difference between what Comforce actually paid the plaintiffs and other similarly situated employees and the amount it should have paid them under New York State law, plus attorneys' fees, interest and costs where allowable.

133.    On this claim for relief, the plaintiffs and those similarly situated employees expressly waive any award of liquidated damages under New York Labor Law § 198.

## FIFTH CLAIM FOR RELIEF
### (Conversion)

134.    The plaintiffs repeat and reallege each and every allegation previously made in this Complaint as if set forth fully herein.

135.    Comforce willfully and maliciously converted funds owed to plaintiffs and other similarly situated employees by withholding monies from them on the pretext that said money was to be used to obtain union representation.

136.    At the time of conversion, the plaintiffs and other similarly situated employees of Comforce were the owners and rightful possessors of the converted funds.

137.    Upon information and belief, Comforce sometimes wrongfully retained the funds it converted from the plaintiffs and other similarly situated employees of Comforce.  On other occasions, Comforce sent the converted funds to CWA or CWA Local 6171.

138.    At all times relevant hereto, the plaintiffs and similarly situated employees of Comforce had a superior right of possession to funds which Comforce wrongfully converted for its own use.  Plaintiffs and other similarly situated employees of Comforce are entitled to immediate possession of the funds wrongfully withheld and converted by Comforce.

139.    At all times relevant hereto, the plaintiffs or similarly situated employees of Comforce did not receive any benefit or service in exchange for the converted funds.

140.    The plaintiffs and other similarly situated employees of Comforce demand the return of all funds so converted, plus statutory interest where permitted by law.   In addition, the plaintiffs and other similarly situated employees of Comforce seek to recover the money they have necessarily expended to recover the converted property as special damages.

## DEMAND FOR TRIAL BY JURY

141.    Pursuant to Federal Rule of Civil Procedure 38, plaintiffs respectfully request a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, it is respectfully requested that this Court assume jurisdiction herein and plaintiffs thereafter demand a trial by jury and judgment against defendants on behalf of themselves and those similarly situated as follows:

a)      On the First Claim for Relief, an award equal to the amount of unpaid wages and overtime wages that said defendants failed to pay to the plaintiffs and other similarly situated employees of Comforce, plus an award of liquidated damages in the amount of 100% of the unpaid overtime, plus attorneys fees, interest and costs as provided for by the FLSA.

b)      On the Second Claim for Relief, an award equal to the union dues and other moneys withheld by the defendants from the plaintiffs and other similarly situated employees of Comforce without written authorization

and an award for attorneys fees as provided under New York Labor Law § 198, plus interest and costs.

c)      On the Third Claim for Relief, an award in the amount required to fully and fairly compensate the plaintiffs and other similarly situated employees for Comforce's failure to pay wages and/or overtime wages as required under the New York Labor Law for all work hours, including travel time, plus an award for attorneys' fees as provided under New York Labor Law, together with interests and costs.

d)      On the Fourth Claim for Relief, an award to the plaintiffs and other similarly situated employees of Comforce equal to unpaid prevailing wages, plus an award of attorneys' fees as provided in New York Labor law, together with interest and costs.

e)      On the Fourth Claim for Relief, an award to the plaintiffs and other similarly situated employees of Comforce to compensate them for being paid inadequate per diems and mileage reimbursement equal to the difference between the amount that Comforce should have paid the plaintiffs and its other similarly situated employees under the law and the amount that Comforce actually paid them, plus attorneys' fees, interest and costs.

f)      On the Fifth Claim for Relief, an award to plaintiffs and other similarly situated employees of Comforce for conversion.

g)      All damages sought above seek, where available, punitive damages, costs and expenses of this suit, and reasonable attorneys' fees.

Dated:  June 21, 2010                          Yours, etc.


                                               s/ Frank S. Gattuso
                                               Frank S. Gattuso, Esq.
                                               Bar Roll No. 513636
                                               Dennis G. O'Hara, Esq.
                                               O'HARA, O'CONNELL & CIOTOLI
                                               *Attorneys for the Plaintiffs*
                                               7207 East Genesee Street
                                               Fayetteville, New York 13066
                                               Telephone: (315) 451-3810

## ATTORNEY VERIFICATION

State of New York   )
                 ) ss.:
County of Onondaga )

      The undersigned, an attorney admitted to practice in the courts of New York State, shows that Deponent is the attorney of record for the Plaintiff in the within action; that Deponent has read the foregoing Third Amended Complaint and knows the contents thereof; that the same is true to Deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters Deponent believes them to be true. Deponent further says this verification is made by Deponent and not by Plaintiff pursuant to CPLR 3020(d)(3) as the Plaintiff is not within the County in which this law firm maintains its law offices.

      The grounds of Deponent's belief as to all matters not stated upon Deponent's knowledge are all information contained within the file.

      The undersigned affirms that the foregoing statements are true, under the penalties of perjury.

Dated:  June 21, 2010

                                      Frank S. Gattuso

Sworn to before me this
21 day of June, 2010

      Notary Public
My Commission Expires   2013

                            **TINA BOUGH**
           **NOTARY PUBLIC - STATE OF NEW YORK**
                   NO. 01BO6207049
              QUALIFIED IN ONONDAGA COUNTY
          COMMISSION EXPIRES JUNE 8, 2013