NEW YORK STATE DEPARTMENT OF LABOR

UNEMPLOYMENT INSURANCE

ADMINISTRATIVE LAW JUDGE SECTION

==========================================================

In the Matter of the Liability for
Unemployment Insurance Contributions
Under Article 18 of the Labor Law of:

RECEIVED
U.I. APPEAL BOARD
TROY, NY

FEB 15 2008

        Eric Eldred
        Claimant - Appellant

        Comforce
        Employer - Respondent

Patricia Smith,
Commissioner of Labor

==========================================================

        Case No:  106-10337
        Appeal Board No.:  538117

Date of Hearing:  2/7/08

Place of Hearing:  Troy Appeal Section

Before:              Christine Martindale,
               Administrative Law Judge

Transcribed by:       Mark Hugo
Appearances:

        Clt:  Eric Eldred
    Clt Rep:  George Mehallow, Esq.
        Emp:  Comforce
    Emp Rep:  Kelley Hanks, HR Manager
    Emp Wit:  Mr. Trailer, Manager
            Alan Whittaker, Pres. Local 6171
            Peter Petix, Senior VP and GM
     Others:  Susan Schultz, ASO

1

Case 3:08-cv-01171-EBB-PEP   Document 91-5   Filed 06/24/10   Page 2 of 61

1    Case Duly Called

2         ALJ MARTINDALE:  One, two, three.

3    Testing one, two, three.  This is Christine

4    Martindale on the record in an adjourned letter

5    remand hearing in the matter of Mr. Eric Eldred

6    in Appeal Board case number 538117.  And today is

7    Thursday February 7th.  The time it was supposed

8    to start was 1 o'clock.  The time now is it's

9    almost 1:10—1:09, actually.  So I'm going to

10   reach the parties and we'll start with Mr.

11   Mehallow.

12        MR. MEHALLOW:  Office.

13        ALJ MARTINDALE:  Good afternoon.  May I

14   please speak to Mr. Mehallow.

15        MR. MEHALLOW:  Speaking.

16        ALJ MARTINDALE:  Hi Mr. Mehallow.  This

17   is Judge Martindale calling a little late with my

18   apologies.  How are you?

19        MR. MEHALLOW:  Good.

20        ALJ MARTINDALE:  Good.  I had a phone

21   call from a board member on another matter so I

22   got held up.  I apologize.  So we have a few

23   people to connect up today and I'm going to start

24   with Ms. Hanks, first and foremost and then we'll

25   see where we go from there.  Okay?

```
 1          Case Duly Called

 2              MR. MEHALLOW:  Yes.

 3              ALJ MARTINDALE:  I'll put you on

 4     conference hold and good afternoon to Mr. Eldred

 5     as well.

 6              FEMALE VOICE 1:  Welcome to Prestige

 7     Comforce Professional Services.  If you need your

 8     party's three digit extension you may dial it at

 9     any time.  One moment please.

10              MS. HANKS:  This is Kelley.  May I help

11     you?

12              ALJ MARTINDALE:  Yes.  Ms. Hanks, this

13     is Judge Martindale calling for the hearing this

14     afternoon.

15              MS. HANKS:  Yes, judge.  How are you

16     today?

17              ALJ MARTINDALE:  I'm fine.  I ran a

18     little behind.  I had a call from a board member

19     on a different case so I apologize.

20              MS. HANKS:  Yeah.  But we're good.

21              ALJ MARTINDALE:  Okay.  Good.  Who do

22     you have with you?

23              MS. HANKS:  I will have John Trailer

24     (phonetic) with me.

25              ALJ MARTINDALE:  Very good.  Let me
```

1       Case Duly Called

2       conference you in with Mr. Mehallow and Mr.

3       Eldred.

4               MS. HANKS:  Okay.

5               ALJ MARTINDALE:  Good afternoon.  Mr.

6       Mehallow, you still there?

7               MR. MEHALLOW:  Yeah.

8               ALJ MARTINDALE:  Mr. Eldred?

9               MR. ELDRED:  Yeah.

10              ALJ MARTINDALE:  And we have Ms. Hanks

11      and Mr. Trailer with her at this time.  Good

12      afternoon everyone.  This is an adjourned

13      telephone conference remand hearing in the matter

14      of Eric Eldred in Appeal Board case number

15      538117.  Let the record reflect that in the room

16      with me is Ms. Susan Schultz.  She is a Senior

17      Hearing Representative and Supervisor on behalf

18      of the Commissioner of Labor.  So welcome to you.

19              MS. SCHULTZ:  Thank you.

20              ALJ MARTINDALE:  Could you confirm for

21      the record that you and I did not discuss this

22      case while we were making—I was making phone

23      calls.

24              MS. SCHULTZ:  That's correct.

25              ALJ MARTINDALE:  Okay.  Further more,

1   Case Duly Called

2       the first hearing that was held on November the

3       8th, 2007 was adjourned in order to get the

4       testimony from Mr. Peter Petix of the Comforce

5       Corporation and Mr. Alan Whittaker, President of

6       Communication Workers of America, AFLCIO Local

7       6171.  Mr. Petix in the meantime requested that

8       Donna Bentley (phonetic) also participate today.

9       So that is our—part of our agenda.  The

10      adjournment that was postponed on November 29th

11      was because of surgery and on January 17th was

12      because of pneumonia so on behalf of the Board we

13      appreciate the parties' patience.  Today I'm

14      going to contact Mr. Petix, Ms. Bentley and Mr.

15      Whittaker, take their testimony, offer cross-

16      examination and take closing arguments.  Before I

17      do that, however, I do have a couple of questions

18      for Ms. Hanks to start out with.  But that's my

19      proposed order of hearing.  You have any

20      questions about that, Mr. Mehallow?

21              MR. MEHALLOW:  No.

22              ALJ MARTINDALE:  Okay.  Could you guys

23      sit a lot closer to the phone because I'm afraid

24      you won't be tape-recorded?

25              MR. MEHALLOW:  Okay.

```
 1        Case Duly Called

 2                ALJ MARTINDALE:  Much better.  Thank

 3        you, sir.  Any questions, Ms. Hanks?

 4                MS. HANKS:  No, ma'am.

 5                ALJ MARTINDALE:  Okay.  And Ms. Schultz?

 6                MS. SCHULTZ:  No.

 7                ALJ MARTINDALE:  Okay.  Ms. Hanks, I'm

 8        going to swear you in at this time.  I'm sure I

 9        did the last time but it's so long ago let's just

10        do it again.  Please raise your right hand.  Do

11        you solemnly swear or affirm that the testimony

12        you're about to give this afternoon is the truth,

13        the whole truth and nothing but?

14                MS. HANKS:  Yes, ma'am.

15        BY ALJ MARTINDALE:

16        Q.    Thank you.  And I'm going to question

17              you from matters I thought about after

18              we had went our separate ways.  Mr.

19              Trailer made it clear last time that he

20              was a manager of projects and not a

21              manager of people.  And since he did not

22              manage the assignment of the installers

23              for the vendors that, you know, hired

24              Prestige Comforce professional services,

25              who was the one who managed the
```

Case Duly Called

```
 1                   Case Duly Called

 2                   assignments?

 3          A.   In this case it was Jim Jackson.

 4          Q.   Okay.  Now, to your knowledge—an you're

 5               in human resources.  Am I correct?

 6          A.   Yes.

 7          Q.   Okay.  To your knowledge, did the

 8               employer, PCPS, require installers like

 9               Mr. Eldred to turn down an assignment

10               before he arrived at a site?

11          A.   That's the normal process.

12          Q.   And why is that?

13          A.   Oh gosh.  So that we can assign someone

14               else to the project.

15          Q.   Okay.  Now, in the particular case of

16               Mr. Eldred if the employer, like Mr.

17               Trailer or Mr. Jackson and there was

18               another gentlemen too, asked Mr. Eldred

19               to report, wait there and work while the

20               per diem rate was being negotiated and

21               then Mr. Eldred leaves when he finds out

22               it was still at $95 how come the

23               employer holds that against Mr. Eldred

24               by not giving him any more assignments?

25          A.   I really can't answer that question.
```

1          Case Duly Called

2          Q.   Who could?

3          A.   Well, I don't know.

4          Q.   Okay.  That's a fair answer.  Let's see

5               what else shakes out.  And to your

6               knowledge of this particular case, when

7               and why did the per diem rate suddenly

8               go back up from $95 to $120 after the

9               claimant left the site?  Do you know

10              why?

11         A.   No ma'am.  I don't.  I wasn't privy to

12              that.

13         Q.   Who was?

14         A.   Ben Jackson.

15         Q.   Okay.  Is he available today if we

16              should need him?

17         A.   No, ma'am.  He's no longer with us.

18         Q.   Okay.  And let's see.  To your

19              knowledge, Ms. Hanks, was there a

20              contract between the claimant and

21              Prestige Comforce Professional Services

22              which mentioned a union membership?

23         A.   Not that I'm aware of.

24         Q.   Okay.  I have no further questions of

25              you at this time.

```
 1              Case Duly Called
 2                   ALJ MARTINDALE:  Do you have any
 3       questions for her, Ms. Schultz?
 4                   MS. SCHULTZ:  No.  I don't.  Thank you.
 5                   ALJ MARTINDALE:  Okay.  Do you have any
 6       question for her, Mr. Mehallow?
 7                   MR. MEHALLOW:  No, judge.
 8                   ALJ MARTINDALE:  Okay.
 9       BY ALJ MARTINDALE:
10           Q.    Anything you need to tell us, Ms. Hanks,
11                 as testimony that I may not have asked
12                 you?
13           A.    No, ma'am.
14                   ALJ MARTINDALE:  Okay.  All right then.
15       We'll move along here.  And Mr. Mehallow, just as
16       a matter of housekeeping, I noticed that the last
17       time I neglected to tell you about section 538 of
18       the labor law with respect to claimant
19       representation.  That you need to not charge a
20       fee of Mr. Eldred unless he prevails and then
21       only upon your application to the Appeal Board
22       and the Board's approval of such a fee.  Any
23       claimant who has paid or been charged a fee prior
24       to approval by the Appeal Board should
25       immediately bring this to the attention of the
```

```
 1      Case Duly Called

 2      Board.  Okay?  I didn't mention that the last

 3      time.  It was my oversight.  You with me, sir?

 4              MR. MEHALLOW:  Yes.

 5              ALJ MARTINDALE:  Wonderful.  Okay.  Now,

 6      let's see if there's anything else here.  And Ms.

 7      Hanks, why did you have Mr. Trailer come along

 8      today?  Do you want him to testify?

 9              MS. HANKS:  No.  It was just requested

10      of him on the order.

11              ALJ MARTINDALE:  Okay.  And we'll see if

12      there's anything that we have that we need to ask

13      him anymore.  Moving right along, I think the

14      next order of business is Mr. Peter Petix.  And

15      you were kind enough to supply me with a phone

16      number but it seems that he wants Donna Bentley.

17      Am I right?  To be on the line?

18              MS. HANKS:  Yes, ma'am.

19              ALJ MARTINDALE:  Okay.  And you provided

20      me with her number as well.  Now, what I think

21      I'll do is call Mr. Petix.  That means I'm going

22      to place everybody on hold and reach him and then

23      from there out try and reach Ms. Bentley as well.

24      So if should lose anybody, please hang up.  I

25      promise to call you right back.  Thanks everyone.
```

1    Case Duly Called

2        MR. PETIX:  Pete Petix.

3        ALJ MARTINDALE:  Hi, Mr. Petix.  This is

4    Judge Martindale calling you from the

5    Unemployment Insurance Appeal Board.

6        MR. PETIX:  - -.

7        ALJ MARTINDALE:  Welcome to the hearing.

8    I'm going to conference in the other folks.  Hang

9    on.

10        MR. PETIX:  Ma'am, I just want to let

11    you know, you may have problems with me answering

12    questions.  I've got a severe case of pneumonia

13    and breathing is an issue.

14        ALJ MARTINDALE:  Yes sir.

15        MR. PETIX:  - - for this call but

16    hopefully it's not a long one.

17        ALJ MARTINDALE:  It shouldn't be.  Thank

18    you, sir.  Hang on.  Do I have you Mr. Mehallow?

19        MR. MEHALLOW:  Yes.

20        ALJ MARTINDALE:  Ms. Hanks?

21        MS. HANKS:  Yes.

22        ALJ MARTINDALE:  Mr. Petix just informed

23    me that he pneumonia and cannot answer questions

24    at a lengthy—for a long period of time.  And is

25    that correct, Ms. Schultz?  Is that what he told

1    Case Duly Called

2    me?

3                    MS. SCHULTZ:  Yes, it is.

4                    ALJ MARTINDALE:  Okay.  Do you want me

5    to call Ms. Bentley, Mr. Petix?

6                    MR. PETIX:  It's up to you, ma'am.

7                    ALJ MARTINDALE:  Okay.  Ms. Hanks, did

8    you want me to call Ms. Bentley or not?

9                    MS. HANKS:  It makes no difference to

10   me.

11                   ALJ MARTINDALE:  Very good.  Then I will

12   dispense with that so that I don't have to

13   accidentally lose anyone.  All right.  Mr. Petix,

14   would your raise your right hand, sir?

15                   MR. PETIX:  Yes, ma'am.

16                   ALJ MARTINDALE:  Thank you.  Do you

17   solemnly swear or affirm that the testimony

18   you're about to give this afternoon is the truth,

19   the whole truth and nothing but?

20                   MR. PETIX:  Yes, I do.

21   BY ALJ MARTINDALE:

22        Q.   Thank you, sir.  What is your name and

23             title for the record?

24        A.   Okay.  It's Peter J., last name Petix,

25             P-E-T-I-X.  The title is senior vice

Eldred-02-07-08

12

Case 3:08-cv-01171-EBB-DEP   Document 91-5   Filed 06/24/10   Page 13 of 61

1      Case Duly Called

2                    president and general manager Comforce

3                    Telecom Inc.

4          Q.    Got it.  Thank you sir.

5          A.    Your welcome.

6          Q.    Do you know how Sumtech (phonetic),

7                    Comforce Telecom and PCPS are related?

8          A.    Yes ma'am.  Comforce Telecom is the

9                    primary company and both Sumtech and

10                   PCPS are business units within that

11                   organization.

12         Q.    Thank you.  What companies has Mr.

13                   Eldred worked for in the past?

14         A.    I believe it was PCPS.

15         Q.    Did he ever work for Sumtech to your—

16         A.    (Interposing) Yeah, yeah.

17         Q.    Okay.

18         A.    And when necessary.  Absolutely.

19         Q.    Okay.  Thank you.  Do any of these three

20                   companies have any connection to

21                   Communication Workers of America AFLCIO

22                   Local 6171?

23         A.    Yes, ma'am.  The Sumtech business unit

24                   has a contract with the TWA that

25                   supplies union personnel as necessary.

1          Case Duly Called

2          Q.    Okay.  To your knowledge, was the

3                claimant, Mr. Eldred, ever a member of

4                this union?

5          A.    Yes.  At different times.

6          Q.    And was that in connection with Sumtech?

7          A.    When you say his connection with

8                Sumtech, ma'am, he has been assigned to

9                Sumtech for the particular jobs that

10               require union labor.

11         Q.    Okay.  I'm writing some notes.

12         A.    No problem.  Appreciate it because I can

13               catch my breath in the in between.

14         Q.    You betcha.  And I'm sorry you're not

15               feeling well, sir.

16         A.    Thank you.

17         Q.    Do you know whether Mr. Eldred's name

18               was ever on this union roster?

19         A.    He looked—and you'll see was assigned to

20               the union at a particular time.  Yes,

21               ma'am.

22         Q.    Who would have assigned him to the

23               union?

24         A.    When you say you're singed to the union

25               what happens is we would get various

```
 1              Case Duly Called

 2                      projects that in some cases because of

 3                      the location require union labor.

 4          Q.     Gotcha.

 5          A.     That varies from location to location.

 6                      And whenever that happens then we will

 7                      request union cards of any individuals

 8                      and they'll be assigned to the union for

 9                      the duration of the project.  But it is

10                      not a continuous, you know, employment,

11                      let's say for years.  It could be for a

12                      week.  It could for several days.  You

13                      know, it could be for the duration that

14                      project goes on.

15          Q.     Understood.  Would Mr. Eldred have known

16                      when he was and was not a member of a

17                      union?

18          A.     When he is, he's notified that he would

19                      be getting a union card and they

20                      normally they'll send out posting work

21                      for the individual in reference to the

22                      union.

23          Q.     Thank you.  Would he get the collective

24                      bargaining agreement that would tell him

25                      whether or not he had grievance rights?
```

1          Case Duly Called

2     A.   You say would he get that.  Could you

3          talk to me in the documentations.  No

4          ma'am.  I don't normally send that out.

5     Q.   Okay.  Did Mr. Eldred know his rights

6          under this union contract?  Was he

7          informed?

8     A.   I cannot honestly answer you, ma'am,

9          'cause I don't know what the discretion

10         was between the recruiter and the

11         individual.

12    Q.   I see.  You're not the recruiter then.

13    A.   No ma'am.  I have absolutely nothing

14         whatsoever to do with recruiting other

15         than they report to me.  I'm still in

16         the management.

17    Q.   That makes sense.  I'm sorry.  Who was

18         the union recruiter to your best

19         knowledge?

20    A.   I have no idea who it was at that

21         particular time.

22    Q.   Is this the reason why Mr. Eldred ended

23         up paying union dues that showed up on

24         his paycheck from PCPS?

25    A.   What happens is if they're assigned to

```
 1              Case Duly Called

 2                      the union a minimum deduction is taken

 3                      from the individuals pay.  The

 4                      individual is aware of what's going on

 5                      because first of all they get the union

 6                      card and they're informed that it will

 7                      be a union location that they're going

 8                      to be working at.

 9       Q.    So then Mr. Eldred should have known

10                      that he had—he was working a union type

11                      of job.

12       A.    As far as I know, yes but, you know, I

13                      can't swear to it because I don't know

14                      discretions but absolutely I would

15                      venture to say so.

16       Q.    Okay.  Did Mr. Eldred ever call you for

17                      help about this issue?

18       A.    I honestly don't recall.

19       Q.    Okay.

20       A.    You know, I know Eric for many, many

21                      years but I don't recall getting

22                      involved in a discussion with him.

23       Q.    Okay.

24       A.    I read an e-mail that's sent to me from

25                      him after this was all - - but I don't
```

Case 3:08-cv-01171-EKP-DEP    Document 91-5    Filed 06/24/10    Page 18 of 61

```
 1            Case Duly Called
 2                   recall having a personal conversation
 3                   with him.
 4            Q.    So you wouldn't be aware of the name of
 5                   any shop steward?
 6            A.    No.  And what do you mean by shop
 7                   steward so I understand?
 8            Q.    Anybody who should have represented him
 9                   if he had a grievance.
10            A.    What normally happens if there is a
11                   grievance they would notify us.  I would
12                   refer them to the union representative
13                   and we may deal with them directly.
14            Q.    Do you have a name of such a union
15                   representative?
16            A.    I was referring to, at that time, Donna
17                   Dowley (phonetic).
18            Q.    Donna—who is now Donna Bentley?
19            A.    Donna Bentley.  Excuse me.
20            Q.    Okay.  Thank you for explaining that.
21            A.    No problem.
22            Q.    I'm almost—
23            A.    (Interposing)  There's no representative
24                   on site.  That's the only thing.  That's
25                   why I asked the question.
```

1      Case Duly Called

2      Q.   I got it.  I'm just checking my

3           questions to see what I don't have to

4           ask you.

5      A.   No problem.

6      Q.   To your knowledge, that specific

7           assignment Mr. Eldred had November the

8           1st of 2005 in Philadelphia, do you know

9           if that was a union job?

10     A.   As far as I know after, you know, all of

11          this came about yes, it was a union job.

12     Q.   To your knowledge, in a union type job

13          would Mr. Eldred have been responsible

14          to work the job first and grieve the per

15          diem rate later?

16     A.   He has right to make a grievance any

17          time.  On site has no bearing whether to

18          union or nonunion job.

19     Q.   I guess the Board would like to know if

20          he had an obligation to go through the

21          union first before leaving that job.

22     A.   There is nothing on that.

23     Q.   Okay.  Do you know whether Mr. Eldred

24          was required to refuse a job before he

25          showed up at a job?

1              Case Duly Called

2        A.   Sure, he  - - anytime.  Absolutely.

3        Q.   Is there a rule that he has to refuse a

4             job before he shows up for it.

5        A.   Well, we consider that common courtesy

6             because what happens traditionally will

7             be that a recruiter will contact the

8             individual, explain the details of the

9             job and see if the individual is

10            available for that particular

11            assignment.  So the individual has, at

12            that point, every right to know to go

13            and say yes I am or no I'm not.

14       Q.   Okay.  Hypothetically, if Mr. Eldred was

15            asked to please show up at the site,

16            start working while we negotiate a per

17            diem rate with the vendor was Mr. Eldred

18            then stripped of his right to refuse to

19            work there?

20       A.   No.

21       Q.   Okay.

22       A.   And if we're talking about this specific

23            case—

24       Q.   (Interposing) Yes, sir.

25       A.   --or hypothetical case of which we're

1          Case Duly Called

2                        talking about.

3          Q.   The last one of November the 1st.

4          A.   With that particular case my

5                understanding, and I can only say be

6                hearsay, was that there's those

7                conversations going on, that the project

8                manager had been involved, it had gotten

9                to the director of operations and this

10               was resolved prior to that date being

11               over with to the satisfaction of

12               everybody and to the satisfaction, I

13               hope, for Eric because they had given

14               him what he had requested.  There was

15               some confusion on what we call Tier One

16               of Tier Two Cities.  Tier One Cities

17               are, let's say, Philadelphia where

18               there's a high cost of living.

19         Q.   Yes.  I understand.

20         A.   Okay.  And this confusion was that it

21               previously been told to the client as a

22               Tier Two City.  When it came to our

23               attention that there was a problem we

24               went back to the client, and this is in

25               the same - - workday, got it resolved

1       Case Duly Called

2               and went back to the team and notified

3               the team and that's what I was told.

4       Q.    Thank you, sir.

5       A.    Your welcome.

6       Q.    Would you have been involved in making

7               any decisions about Mr. Petix ever

8               getting assignments thereafter?  In

9               other words, if he left before that

10              final resolution was it up to you

11              whether or not he got more assignments?

12      A.    Was it up to me?  I would rarely every

13              get involved.

14      Q.    Okay.  So it would have been—

15      A.    (Interposing) - -.

16      Q.    --not involved in recruiting.  Gotcha.

17              Thank you sir.  I'm almost done.  I

18              think I am done as a matter of fact.

19              ALJ MARTINDALE:  Ms. Hanks, do you have

20      questions for Mr. Petix?

21              MS. HANKS:  No, ma'am.

22              ALJ MARTINDALE:  And do you have any

23      questions for Mr. Petix, Mr. Mehallow?

24              MR. MEHALLOW:  Just a couple.

25      BY MR. MEHALLOW:

1         Case Duly Called

2            Q.   Mr. Petix, when would the person who's—

3                like Mr.—or who's not permanently in

4                this union, say, where would he get a

5                card when he showed up on site, do you

6                know?

7            ALJ MARTINDALE:  Where would he get

8   what, please?

9            MR. MEHALLOW:  His union card.

10   BY MR. MEHALLOW:

11           A.   Usually that is delivered by overnight

12                mail within 24 hours of the assignment.

13                I think that's the normal.

14           Q.   You mean the temporary address on site?

15           A.   Excuse me?

16           Q.   How do you deliver that if he's at a

17                temporary location?

18           A.   We usually try to get an address where

19                we can get that delivered to.  In some

20                cases we may send it to what we could

21                call our supervisor and he has the cards

22                priors to the individuals.  There are

23                clients that the individual has a local

24                address that we can send it to.  So

25                there's different methods of getting

1          Case Duly Called

2                    that card to them.

3          Q.   So there's at least a 24 hour delay.

4               Right?

5          A.   It's usually delivered prior to them

6               getting to the site because the issue is

7               that if there is another union present

8               they have the right to challenge any

9               person on site to see if they have a

10              union card.  So whatever is feasible we

11              try to get that card to the individual

12              prior to them getting to the site.

13         Q.   But who knows that Mr. Eldred had a

14              union card?

15         A.   I did nothing.  I honestly have no idea.

16              I can't even ask the young lady that

17              handles because she had a baby last June

18              and prefers to stay home and take care

19              of the baby so I have no idea.

20              ALJ MARTINDALE:  The question was, so

21         the record is clear because I'm sure Mr.

22         Mehallow's question did not come through, whether

23         or not claimant had the union card when he

24         arrived in Philadelphia.  Is that your question,

25         Mr. Mehallow?

1          Case Duly Called

2               MR. MEHALLOW:  Yes.

3               ALJ MARTINDALE:  Okay.

4               MR. PETIX:  Your honor, I can't honestly

5     answer that to my knowledge.  I don't have that

6     information.

7               ALJ MARTINDALE:  Okay.  Anything else

8     Mr. Mehallow of Mr. Petix?

9               MR. MEHALLOW:  And yeah.

10    BY MR. MEHALLOW:

11         Q.   Just on the other issue was the—did you

12              personally go about negotiating the per

13              diem for that job?

14         A.   Not at all.

15         Q.   Then how do you know when it was

16              actually resolved?

17         A.   I'm going by what happened after the

18              claim came in and I got involved with

19              it.  So that's how I got involved.  I

20              don't get involved with assigning a per

21              diem or anything else.

22         Q.   Well, you said that—did you say that Mr.

23              Eldred had already left before it was

24              resolved or—

25         A.   (Interposing)  I didn't say that all.  I

1   Case Duly Called

2           said it was resolved within the first

3           day and as far as I know he was still

4           there.  I can't honestly answer you.

5   BY ALJ MARTINDALE:

6       Q.   Who told you about that, Mr. Petix

7            'cause I recognize that you don't have

8            firsthand knowledge?

9       A.   Oh God.  It had to be one of the people

10           PCPS.  Ma'am, I don't know exactly as

11           there was a number of different people I

12           spoke to.

13      Q.   Okay.  Fair enough.

14           ALJ MARTINDALE:  Go ahead, Mr. Mehallow.

15           MR. MEHALLOW:  I have no further

16   questions.

17           ALJ MARTINDALE:  Mr. Petix, we have just

18   one more person who may ask you some questions.

19   Ms. Schultz, for the Commissioner of Labor, do

20   you have any questions.

21           MS. SCHULTZ:  I have no questions.

22   Thank you.

23           ALJ MARTINDALE:  Okay.  Anything you

24   need to redirect him about, Ms. Hanks?

25           MS. HANKS:  No, ma'am.

1   Case Duly Called

2           ALJ MARTINDALE:  Okay.  Mr. Petix, I

3   recognize how much trouble this was for you.

4   Thank you for appearing today.

5           MR. PETIX:  No problem.  And do you need

6   me anymore today?

7           ALJ MARTINDALE:  No.  I think that

8   should do the trick, sir.  Thank you.

9           MR. PETIX:  Thank you very much.

10          ALJ MARTINDALE:  Have a great day.

11          MR. PETIX:  Okay.  Thank you.

12          ALJ MARTINDALE:  Bye-bye now.  Okay.

13  Let the record reflect that Mr. Petix has hung

14  up.  And at this point in time, I believe the

15  next person we're supposed to questions was Mr.

16  Alan Whittaker and I will reach him at this time.

17  Anything you want to tell me, Ms. Hanks, before I

18  do that?

19          MS. HANKS:  No, ma'am.

20          ALJ MARTINDALE:  Okay.  Ms. Schultz, any

21  questions?

22          MS. SCHULTZ:  No.

23          ALJ MARTINDALE:  Mr. Mehallow?

24          MR. MEHALLOW:  No.

25          ALJ MARTINDALE:  Okay.  Very good.  Then

Case 3:08-cv-01171-LEK-DEP   Document 91-5   Filed 06/24/10   Page 28 of 61

1    Case Duly Called

2         I'll do that.  I'm going to place you all on hold

3    and reach him.  Thank you.

4              FEMALE VOICE 2:  - - Melinda.

5              ALJ MARTINDALE:  Yes.  Good afternoon.

6    My name is Judge Martindale and I'm calling from

7    the Unemployment Insurance Appeal Board for the

8    state of New York.

9              FEMALE VOICE 2:  Okay.

10             ALJ MARTINDALE:  Is Mr. Alan Whittaker

11   there?

12             FEMALE VOICE 2:  May I ask just one

13   moment please?

14             ALJ MARTINDALE:  Thank you.

15             FEMALE VOICE 2:  Your name again?  Sorry

16   judge.

17             ALJ MARTINDALE:  Martindale.

18             FEMALE VOICE 2:  Martindale.  Okay.

19             ALJ MARTINDALE:  Thank you.

20             MR. WHITTAKER:  Alan Whittaker.

21             ALJ MARTINDALE:  Good afternoon, Mr.

22   Whittaker.  This is Judge Martindale calling you

23   from the Unemployment Insurance Appeal Board.

24   We're in Troy, New York.  Welcome.

25             MR. WHITTAKER:  Thank you.

1    Case Duly Called

2                    ALJ MARTINDALE:  Let me conference you

3    in with everyone else.  Do I still have you, Mr.

4    Mehallow?

5                    MR. MEHALLOW:  Yes.

6                    ALJ MARTINDALE:  Do I have you, Ms.

7    Hanks?

8                    MS. HANKS:  Yes.

9                    ALJ MARTINDALE:  And I have Mr.

10   Whittaker.

11                   MR. WHITTAKER:  Yes.

12                   ALJ MARTINDALE:  Okay folks, welcome.

13   This is an adjourned telephone conference letter

14   remand hearing where Mr. Alan Whittaker's name

15   came up in the course of testimony and we have

16   some questions to ask him this afternoon.  Thank

17   you for joining us, sir.  Present in the room

18   with me is the Commissioner of Labor's

19   representative Ms. Susan Schultz.  On the phone

20   is Ms. Hanks for the employer and Mr. Mehallow on

21   behalf of the claimant, Mr. Eldred, who is also

22   present.  Mr. Whittaker, do you mind if we get

23   right to questions?

24                   MR. WHITTAKER:  Oh, no problem.  Thank

25   you.

1              Case Duly Called

2                      ALJ MARTINDALE:  Wonderful.  Would you

3      please raise your right hand, sir?  Do you

4      solemnly swear or affirm that testimony you are

5      about to give us this afternoon is the truth, the

6      whole truth and nothing but?

7                      MR. WHITTAKER:   I do.

8      BY ALJ MARTINDALE:

9           Q.   Thank you, sir.  And would you state

10               your name and your position with the

11               Communication Workers of America, Local

12               AFLCIO 6171, for the record?  What's

13               your name and position?

14          A.   Alan Whittaker.  I'm the president in

15               the CWA Local 6171 in Krum, Texas.

16          Q.   K-R-U-M?  Krum?

17          A.   Yes, ma'am.

18          Q.   Wonderful.  Do you recognize a man by

19               the name of Eric Eldred, his name?

20          A.   Only recently by the information that

21               I've received from the Unemployment

22               Board there.

23          Q.   Okay.  And to your knowledge has Mr.

24               Eric Eldred ever called you about being

25               a member of your organization?

```
 1                    Case Duly Called

 2              A.   No, ma'am.

 3              Q.   Okay.  Do you know if he has ever been

 4                   listed on your union member roster as a

 5                   member?

 6              A.   After I received the correspondence from

 7                   the Unemployment Board up there I did

 8                   some research on Mr. Eldred and he was a

 9                   member of my local in 2002.

10              Q.   And do you know what in connection with

11                   what company?  Did I lose you?

12              A.   I'm still.  Give me one second—

13              Q.   (Interposing) Oh sure, sure.

14              A.   --and I'll tell you which company.

15              Q.   Thank you for looking.

16                   ALJ MARTINDALE:  I'm going to go briefly

17         off the record (break in audio).

18    BY ALJ MARTINDALE:

19              Q.   Yes, Mr. Whittaker.

20              A.   That would have been in connection with

21                   Sumtech corporation.

22              Q.   Okay.  Thank you very much.  And do you

23                   have a copy of his name on that list?

24              A.   Yes, I do.

25              Q.   Okay.
```

Case 3:08-cv-01171-LEK-DEP   Document 91-5   Filed 06/24/10   Page 32 of 61

1    Case Duly Called

2            ALJ MARTINDALE:  Do you see the need for

3    that, Ms. Schultz?  His name on the list?

4            MS. SCHULTZ:  No.  That's his testimony.

5            ALJ MARTINDALE:  Okay.  Do you see the

6    need for that, Ms. Hanks?

7            MS. HANKS:  No.

8            ALJ MARTINDALE:  Mr. Mehallow?

9            MR. MEHALLOW:  Is this the actual list?

10           ALJ MARTINDALE:  I beg your pardon?

11           MR. MEHALLOW:  Is this the actual list?

12           ALJ MARTINDALE:  There's an actual list

13    with Mr. Eldridge's name on it when he was

14    working for Sumtech.

15           MR. MEHALLOW:  But we don't have—no one

16    has it.

17           ALJ MARTINDALE:  Mr. Whittaker has it.

18    Do you need that?  Was his testimony enough?

19           MR. MEHALLOW:  I believe you asked him

20    to produce it.

21           ALJ MARTINDALE:  I did.  I was

22    wondering—Mr. Whittaker, I don't know if you got

23    a copy of our notice of hearing.

24           MR. WHITTAKER:  Did.

25           ALJ MARTINDALE:  You did.  And are you

1    Case Duly Called

2    able to fax that to Mr. Mehallow, Ms. Hanks and

3    myself this afternoon.

4         MR. WHITTAKER:  Sure.

5         ALJ MARTINDALE:  Pardon?

6         MR. WHITTAKER:  Absolutely.

7         ALJ MARTINDALE:  Wonderful.  We will

8    take a brief recess to do that just because I

9    think the Board would like to see that.  May I

10   give you different fax numbers, sir?

11        MR. WHITTAKER:  Yes, ma'am.

12        ALJ MARTINDALE:  All right.  Let's start

13   with Ms. Hanks.  What's your fax number?

14   MS. HANKS:  (572) 698—I'm sorry, I've

15   got to look it up because I never do it.  I'm

16   sorry, (972) 692-6998.

17        ALJ MARTINDALE:  You got that, Mr.

18   Whittaker?

19        MR. WHITTAKER:  Yes.

20        ALJ MARTINDALE:  Okay.  And our fax

21   number here at the Board is (518) 402-6208.  And

22   Mr. Mehallow, what's your fax number?

23        MR. MEHALLOW:  Currently, I don't have -

24   - fax number.

25        ALJ MARTINDALE:  Do we have to hang up

1    Case Duly Called

2    with you so you can get it?

3            MR. MEHALLOW:  I shouldn't get it

4    through this line.  I don't know what the problem

5    is.  I can't receive a fax right now.

6            ALJ MARTINDALE:  Okay.  Do you—are you

7    satisfied that I will get a copy and then mail it

8    to you immediately after this hearing?

9            MR. MEHALLOW:  That'd be fine, judge.

10           ALJ MARTINDALE:  Okay.  In that case I

11   will briefly go off the record and allow Mr.

12   Whittaker to do this and we will not discuss the

13   case.  Please everybody, stay where you are.

14   Thank you, Mr. Whittaker.

15           MR. WHITTAKER:  Sure.

16           ALJ MARTINDALE:  Okay.  See you in few

17   minutes.  Off the record.

18           (end side A)

19           (begin side B)

20           ALJ MARTINDALE:  This is Judge

21   Martindale, back on the record at 1:52 p.m. on

22   side 2 of tape 1 in the matter of Eric Eldred.

23   And let the record reflect that I have received

24   Mr. Whittaker's one, two, three, four, five, six

25   page fax, which I am also showing Ms. Shultz at

```
 1            Case Duly Called

 2     this time.  Ms. Hanks, did you get your copy?

 3                  MS. HANKS:  Yes, ma'am.

 4     BY ALJ MARTINDALE:

 5            Q.   Wonderful.  And Mr. Whittaker, Mr.

 6                 Eldred's name is underlined on a few of

 7                 those pages.  Am I correct?

 8            A.   Yes, ma'am.

 9            Q.   Okay.  And to your knowledge, was he a

10                 consistent member of this union or just

11                 by job as needed?

12            A.   By job as needed.

13            Q.   Okay.  And for each and every job that

14                 he got would he have a special person

15                 assigned as his shop steward or the

16                 person he could talk to, a union rep.

17            A.   I believe that back then at the

18                 timeframe I was not president and I'm

19                 not sure who the shop steward was at

20                 that time but there was one assigned to

21                 that group up there back then.

22            Q.   Okay.  And this is was only with respect

23                 to the Sumtech Corp.?  Correct?

24            A.   Yes, ma'am.

25            Q.   Is—would—did this have anything to do
```

1      Case Duly Called

2                    with the Prestige Professional—excuse

3                    me—the Prestige Comforce Professional

4                    Services Company?

5      A.   As far as I know it would only be for

6                    Sumtech—those groups like that are split

7                    into different groups and the - - that

8                    we receive is by the DBA.

9      Q.   Okay.  Am I am going to mark for

10                   identification this six page document

11                   you have faxed to us as Board exhibit 1

12                   for today and put my initials and

13                   today's date so the Board knows that we

14                   looked at it.

15     A.   Yes, ma'am.  If you will note in that

16                   upper left-hand corner—

17     Q.   (Interposing) Yes, sir.

18     A.   These documents are documents that we

19                   received from CWA International in

20                   Washington and they are by process unit—

21                   and you'll note Sumtech Corporation in

22                   the upper left-hand corner.

23     Q.   Yes.  I do notice Sumtech on all the

24                   pages in the top left and I also notice

25                   they are by week—July the 17th of 2002,

1              Case Duly Called

2                    August the 6th of 2002, May 29th of 2002,

3                    May 2nd of 2002, April 19th 2002 and April

4                    11th 2002.   Does that mean he'd only be a

5                    member for those particular weeks?

6         A.    We issue those cards in three-month

7                    increments.

8         Q.    Okay.

9         A.    Issue—once we issue a membership card

10                   it's good for three months and then, you

11                   know, there are members during any job

12                   that they're doing that three months.

13                   Then we get a call from the company and

14                   we reissue new cards at the expiration

15                   of those if there's a need as a, you

16                   know, as needed basis.

17        Q.    So would Mr. Eldred know that he was a

18                   member for a particular job by receiving

19                   a copy of this card?

20        A.    Probably not for a particular job but

21                   for a particular timeframe.

22        Q.    Okay.   Thank you for making that clear.

23                   And when he gets that does he—when he

24                   gets that card identifying him as a

25                   member how does he know what his rights

```
 1              Case Duly Called

 2                        and responsibilities are as a union

 3                        member?

 4              A.        We have contract books that have been

 5                        issued for delivery by the company in

 6                        all cases of temporary cards that we

 7                        issue.

 8              Q.        Would Mr. Eldred know whether or not he

 9                        was supposed to file a grievance before

10                        leaving a job site if he was upset with

11                        something?

12              A.        Ma'am, I can't attest to that but the

13                        contract book does outline the grievance

14                        procedure.

15              Q.        And does that grievance procedure bind

16                        the union member to the particular

17                        company he's working for, in other

18                        words, Sumtech?  In other words, does

19                        that union contract tell Mr. Eldred that

20                        he has to obey the union rules when he

21                        deals with Sumtech?  Is that how it

22                        works?

23              A.        I think that would be a fair assessment.

24                        Yes, ma'am.

25              Q.        Okay.  But you don't have any record of
```

```
 1                Case Duly Called
 2                    him being a union member when he was
 3                    working for the Prestige Comforce
 4                    Professional Services Group?  Dou you?
 5     A.   No, ma'am, I do not.
 6     Q.   Okay.  And I think that would take care
 7                    of everything because you're telling me
 8                    it did not apply to his last job that
 9                    we're focused on today.  Am I correct
10                    that this whole union business would not
11                    necessarily have applied to his last job
12                    in Philadelphia?
13     A.   I'm not sure when that last job in
14                    Philadelphia was, ma'am.
15     Q.   November the 1st, 2005.
16     A.   Eldred was not a member of this local in
17                    2005.
18     Q.   Mr. Whittaker, my questions for you are
19                    complete and I'm so grateful that you
20                    joined us.  I would like to give other
21                    folks a chance to question you and then
22                    we can let you go.  Okay?
23     A.   Yeah.
24          ALJ MARTINDALE:  All right.  Ms. Hanks,
25     any questions for Mr. Whittaker?
```

1       Case Duly Called

2                   MS. HANKS:  No, ma'am.

3                   ALJ MARTINDALE:  Okay.  Any questions

4       for Mr. Whittaker, Ms. Schultz?

5                   MS. SCHULTZ:  No questions.

6                   ALJ MARTINDALE:  And any questions for

7       MR. Whittaker, Mr. Mehallow?

8                   MR. MEHALLOW:  No.

9                   ALJ MARTINDALE:  Okay.  Mr. Whittaker,

10      once again, thanks so very much.  And you have a

11      great day.  We'll let you go.

12                  MR. WHITTAKER:  Thank you.

13                  ALJ MARTINDALE:  Okay.  Bye now.

14                  MR. WHITTAKER:  Bye.

15                  ALJ MARTINDALE:  Okay.  Ms. Hanks, I see

16      that you have Mr. Trailer with you and I would

17      like to ask him a couple of questions so I'm

18      going to recall you, Mr. Trailer, under oath.

19      Okay.

20                  MS. HANKS:  Okay.  One second.  His

21      phone rang.  Hold on one second.  He's just

22      outside the door here.  Hold on one moment.

23                  ALJ MARTINDALE:  Sure.  No problem.  We

24      can wait briefly until things are more ready to

25      proceed.  Off the record (break in audio).  Well,

 1      Case Duly Called

 2      welcome back.  And we just had a brief recess

 3      waiting for Mr. Trailer to return and is it true,

 4      Ms. Schultz, we didn't discuss this case?

 5              MS. SCHULTZ:  Yes.

 6              ALJ MARTINDALE:  Is that true, Mr.

 7      Mehallow?

 8              MR. MEHALLOW:  Yes.

 9              ALJ MARTINDALE:  Ms. Hanks?

10              MS. HANKS:  Yes.

11              BY ALJ MARTINDALE:

12          Q.   Okay.  Mr. Trailer, welcome back.

13      I'm recalling you under oath for a couple of

14      brief questions.  And I distinctly recall your

15      testimony that you had nothing to do with

16      managing people and their assignments.

17          A.   That is correct.

18          Q.   Okay.  Were you aware at all of the

19      negotiations with the vendor as to the per diem

20      rate?  Or was that Mr. Jackson?

21          A.   That was Mr. Jackson.

22          Q.   Okay.  And do you have any

23      knowledge of Mr. Eldred and membership in a

24      union.

25          A.   No, ma'am.  I did not at the time.

1    Case Duly Called

2              Q.   Okay.  My questions are complete.

3              ALJ MARTINDALE:  Do you have any

4    questions for him, Ms. Hanks?

5              MS. HANKS:  No, ma'am.

6              ALJ MARTINDALE:  Ms. Schultz?

7              MS. SCHULTZ:  No.

8              ALJ MARTINDALE:  Any questions for him,

9    Mr. Mehallow?

10             MR. MEHALLOW:  No.

11             ALJ MARTINDALE:  Okay.  Mr. Tailer,

12   you're welcome—Trailer, you're welcome to stay on

13   if you would like to.  You don't have to if you

14   don't want to.  All right.  Before I continue

15   with Mr. Eldred himself, I would like to ask each

16   of the parties for their comments and any

17   objections they may have to my entering the

18   listing of union members back in 2002 that Mr.

19   Whittaker sent us.  I'm showing this to Ms.

20   Schultz.  Take a look at it.  Ms. Hanks, if you

21   would look at it.

22             MS. HANKS:  Yes.

23             ALJ MARTINDALE:  It is the six pages.

24   It does have to do with Sumtech and it is back in

25   2002.

1      Case Duly Called

2                MS. HANKS:  Yes, ma'am.

3                ALJ MARTINDALE:  Any comments or

4      objections, Ms. Hanks?

5                MS. HANKS:  No, ma'am.

6                ALJ MARTINDALE:  Okay.  How about you,

7      Ms. Shultz?

8                MS. SCHULTZ:  No objection but the

9      Commissioner does request a copy, please.

10               ALJ MARTINDALE:  By all means.  You and

11     Mr. Mehallow will get a copy.  And Mr. Mehallow,

12     any comments or any objections to this union list

13     going into the record today?

14               MR. MEHALLOW:  First, did you tell me -

15     - from '02 to '05?

16               ALJ MARTINDALE:  Your question is a

17     little muddle because of our phone.

18               MR. MEHALLOW:  Does the document the

19     time period from 2002 through 2005?

20               ALJ MARTINDALE:  Absolutely not.  It

21     deals the weeks in 2002 that I mentioned earlier.

22     Would you like me to repeat those weeks?

23               MR. MEHALLOW:  No.  No.  That's fine.

24               ALJ MARTINDALE:  Okay.  It's strictly

25     dealing from April 'til August of 2002 only.

1        Case Duly Called

2                    MR. MEHALLOW:  Thank you.

3                    ALJ MARTINDALE:  All right.  It is so

4        entered then.

5                    MR. MEHALLOW:  Thank you, ma'am.

6                    ALJ MARTINDALE:  Thank you.  It is so

7        entered as Board exhibit number 1.  Mr. Eldred,

8        may I ask you to sit near the phone please?

9                    MR. ELDRED:  Hello.

10       BY ALJ MARTINDALE:

11           Q.   Hi Mr. Eldred.  Welcome back.  I'm

12                recalling you under oath and I just

13                wanted to give you the opportunity to

14                make any comments about what you heard

15                from Mr. Petix and Mr. Whittaker with

16                respect to any union membership that you

17                may have had with Prestige Comforce

18                Professional Services.

19           A.   That Mr. Whittaker said that I wasn't a

20                member.

21           Q.   Could you speak up louder, please?

22           A.   I'd like to discuss the fact that I was

23                a member in 2005.

24           Q.   You were?

25           A.   Upon receiving a phone number from Mr.

1          Case Duly Called

2                    Petix to contact Donna Bentley I

3                    contacted the union who looked my name

4                    up on file, I believe it was Milton

5                    Grant (phonetic) the vice president of

6                    Local CWA 6171 who stated I was a member

7                    beginning October 26, 2005 and my union

8                    dues had been paid.

9          Q.     I see.  So you spoke to Milton who?

10         A.     Milton Grant.

11         Q.     Grant.  And that was at Ms. Bentley's

12                suggestion?

13         A.     Along with Ms. Bentley, also.  Correct.

14         Q.     So you were a member in that timeframe.

15         A.     Correct.  From the beginning date that

16                is burned in my memory is October 26th,

17                2005, which I was currently receiving

18                unemployment benefits and at home.

19         Q.     I'm writing some notes.  And while you

20                were getting those benefits you got a

21                CWA card.

22         A.     I did not receive a card.  No.

23         Q.     So how did you know you were a member?

24         A.     I told over the phone by Milton Grant

25                and Donna Bentley that my union dues

```
 1              Case Duly Called

 2                          start date was October 26th.

 3              Q.    Thanks for making that clear.  Now when

 4                    they, so to speak, draft you back into a

 5                    union for a particular job do they give

 6                    you—they, meaning the employer.  Does

 7                    anybody give you a copy of a union

 8                    contract with your rights and

 9                    responsibilities laid out?

10              A.    No, ma'am.  I never received a contract.

11              Q.    Did you know about any grievance rights

12                    that you may or may not have had?

13              A.    I did not.

14              Q.    I'm getting the impression that the

15                    membership in a union was to satisfy any

16                    unions that may have been located where

17                    the worksite was.  That certain jobs

18                    required union membership.  Is that

19                    correct?

20              A.    From what I'm being told.  Yes.

21              Q.    So were you aware of that as part of

22                    your assigning?

23              A.    No.  I was not.  I had been on this site

24                    prior and never had any union dues or

25                    issues.
```

```
 1              Case Duly Called

 2        Q.    Let me write that down.  Thank you.  So

 3              you had worked on that site before.

 4        A.    Yes, ma'am.  This union that did the

 5              work would be IBEW.

 6        Q.    IBEW, which is a totally different union

 7              from the communication workers.

 8        A.    Yes, ma'am.

 9        Q.    And you never got a card from them

10              either.

11        A.    No, ma'am.  I was not a union member.

12        Q.    So you were not a member of IBEW but you

13              were somehow told over the phone by Mr.

14              Grant and through Ms. Bentley that you

15              were some kind of union member.

16        A.    Yes.  I can give you the date around

17              where I was called up.  The—around

18              February 23rd, 2006 when Donna Bentley

19              gave me the first union contract I had

20              ever seen.

21        Q.    Yes.  And you were kind enough to

22              provide that, I think, among your other

23              exhibits.

24        A.    Yes, ma'am.

25        Q.    All right.  And the union she alleged
```

```
 1              Case Duly Called

 2                   you were a part of at that time was CWA.

 3                   Correct?

 4        A.   It was 6171.

 5        Q.   Yes.  And you were never told that you

 6                   were a member of IBEW.  Is that correct?

 7        A.   Correct.

 8        Q.   Okay.  Is there something else that I

 9                   should know that I may have overlooked

10                   that you need to tell me?

11        A.   I don't believe so.

12        Q.   Okay.  If something occurs to you before

13                   we end today please let me know.  My

14                   questions then are complete for you.

15             ALJ MARTINDALE:  Mr. Mehallow, do you

16        want to ask him anything?

17   BY MR. MEHALLOW:

18        Q.   At this point, you never got a card but

19                   you got a contract?

20        A.   Yes.

21        Q.   - -.

22             ALJ MARTINDALE:  It's very hard to hear

23        you, Mr. Mehallow.  Go closer.

24   BY MR. MEHALLOW:

25        Q.   - -.  So you never got any—we're good.
```

1    Case Duly Called

2         While in Philadelphia you had no

3         information that you were a union

4         member.

5    A.   Correct.

6         MR. MEHALLOW:  Okay.  No further

7    questions.

8         ALJ MARTINDALE:  And I'm still here.

9    I'm just writing notes.  All right.  Any

10   questions from you, Ms. Hanks?

11        MS. HANKS:  No, ma'am.

12        ALJ MARTINDALE:  Okay.  For Mr. Eldred.

13   All right.  And how about you, Ms. Schultz, for

14   Mr. Eldred.  Go ahead.

15        MS. SCHULTZ:  Yes.  Just a couple

16   questions.

17   BY MS. SCHULTZ:

18   Q.   Mr. Eldred, I realize I was not at the

19        last hearing.  I'm filling in for Ms.

20        Willy (phonetic) today.  She had a

21        family emergency but she did tell me

22        that at the last hearing.  I believe it

23        was the last one—I know there's been

24        several—that you had indicated that you

25        worked for Sumtech in 1998 and that you

Case 3:08-cv-01171-EEF-DEP   Document 91-5   Filed 06/24/10   Page 50 of 61

1                  Case Duly Called

2                          thought you were building up union time.

3                          Do you recall saying that?  Mr. Eldred?

4          A.    Hello?

5          Q.    We're here.

6          A.    Yes, ma'am.

7          Q.    Did you hear the question?

8          A.    Yes.

9          Q.    Okay.  So you do recall saying that.

10         A.    Correct.

11         Q.    So in 1998 you were aware that you were

12               a union member then.  Is that true?

13         A.    That is true.

14         Q.    Okay.  And what union were you a member

15               of?

16         A.    CWA.

17         Q.    Okay.  At that point in time, did you

18               have any information since you thought

19               you were building up time?  Did you have

20               any information from the union then as

21               far as the contract?

22         A.    No, ma'am.  Just from prior—I was in a

23               union prior to that, which I occurred

24               time and seniorities so I would have

25               thought the same for this one.  That's

```
 1              Case Duly Called

 2                   the only reason.

 3    Q.   Oh, Okay.  So prior to 1998 you were in

 4         a different union from the CWA.

 5    A.   Not CWA.  No I wasn't—not CWA.

 6    Q.   Okay.  All right.  So you assumed then

 7         that CWA would be the same is what

 8         you're saying.

 9    A.   Correct.

10    Q.   Okay.  But back in 1998 you did have any

11         contract or any union card then either.

12    A.   No contract.  A union card was issued

13         but what we were told was it's the

14         payroll company we switched to.

15    Q.   What does that mean?

16    A.   That is what I was told.  I had no idea

17         what it means.  There is—what—when I

18         asked if there was a contract or a

19         contact I was told no, there is none.

20    Q.   All right.  Was that in 1998, you mean?

21    A.   Yes, ma'am.

22    Q.   Okay.  And then in 2005, I guess I

23         understand from your testimony that you

24         did not have a contract for the job in

25         Philadelphia either.
```

```
 1              Case Duly Called
 2        A.   Correct.
 3        Q.   Okay.
 4        A.   Same answers were given.
 5        Q.   Okay.  So you asked for a union—if you
 6             have a union rep.  Or did you ask if you
 7             were a union member on that job?
 8        A.   Oh yes.  When—this was the first time I
 9             had seen anything of a union and I asked
10             where's the contract?  Who's the
11             representative?  I was told there was
12             none for many weeks until I asked them
13             to put it in writing.
14        Q.   Okay.  When was the first time you asked
15             about if that was a union job?
16        A.   Upon receiving my pay-stub for that
17             project in Philadelphia.  I'm trying to
18             look for my pay-stub right now.
19        Q.   All right.  That was after you quit.  Is
20             that correct?
21        ALJ MARTINDALE:  After—he said that he just
22             was separated by no assignment.
23   BY MS. SCHULTZ:
24        Q.   Oh, okay.  After you left, in other
25             words.
```

```
 1                 Case Duly Called

 2           A.   Could you repeat that, please?  I didn't

 3                understand.

 4           Q.   Okay.  Yes.  The judge was clarifying a

 5                little bit here to—after you separated

 6                from that assignment is that when you

 7                started questioning whether or not you

 8                were in a union?

 9           A.   Correct.  I had already been separated

10                when it was brought to my attention.

11           Q.   Okay.  So while you were—when you were—

12                when you accepted the job in

13                Philadelphia did you ask anyone if it

14                was a union job?

15           A.   No, because I was under contract with

16                Comforce as of 2003 and it's a nonunion

17                contract that I was under since, I

18                believe, March 14th, 2003, which is in

19                the record.

20           Q.   Okay.  All right.  And so when you

21                received the assignment in Philadelphia

22                you just thought that you were still

23                under that contract.  Is that correct?

24           A.   Yes, ma'am.

25           Q.   Okay.  So you didn't ask anybody if you
```

```
 1              Case Duly Called

 2                      were in union status then on that

 3                      particular assignment.  Is that correct?

 4         A.    That's correct.

 5         Q.    Okay.  Did anybody tell you while you

 6                      were on that job that you were in a

 7                      union?

 8         A.    No, ma'am.

 9         Q.    I have no further questions.

10               ALJ MARTINDALE:  Thank you, Mr. Eldred.

11    Any follow up questions, Mr. Mehallow?

12               MR. MEHALLOW:  No.

13               ALJ MARTINDALE:  Any follow up

14    questions, Ms. Hanks?

15               MS. HANKS:  No, ma'am.

16               ALJ MARTINDALE:  I'm just writing notes.

17    All right everyone.  All right.  Before we come

18    to closing, which we're rapidly approaching at

19    this point in time, I just want to make sure of a

20    few housekeeping things so the record is clear

21    and clean.  Ms. Hanks, is there any other

22    testimony or evidence that you need to present

23    for—on behalf of the employer?

24               MS. HANKS:  No, ma'am.

25               ALJ MARTINDALE:  Okay.  Ms. Shultz, is
```

Case 3:08-cv-01171-LEK-DEP   Document 91-5   Filed 06/24/10   Page 55 of 61

1      Case Duly Called

2      there any other testimony or evidence that you

3      need to present for the record on behalf of the

4      Commissioner of Labor?

5                MS. SCHULTZ:  No.

6                ALJ MARTINDALE:  Mr. Mehallow, is there

7      anything else in terms of testimony and evidence

8      that you need to present for this record for Mr.

9      Eldred?

10               MR. MEHALLOW:  No.

11               ALJ MARTINDALE:  Okay.  And before we go

12     to closing arguments, does anybody have a

13     question for anybody else?  Ms. Hanks?

14               MS. HANKS:  No, ma'am.

15               ALJ MARTINDALE:  Ms. Schultz?

16               MS. SCHULTZ:  No.

17               ALJ MARTINDALE:  Mr. Mehallow?

18               MR. MEHALLOW:  No.

19               ALJ MARTINDALE:  Okay.  Then in that

20     case everyone what the Board is looking for at

21     this time is your argument as to how it is the

22     Board should rule on the issues in front of it.

23     There are three issues—the voluntary of leaving

24     of employment without good cause, the alleged

25     willfulness representation in order to receive

1       Case Duly Called

2       benefits and I believe there was also a

3       recoverable overpayment component to this.  Yes,

4       of $1,620.  I'm going to have Ms. Schultz start,

5       Ms. Hanks follow up and give the last word to Mr.

6       Eldred's representative since Mr. Eldred is the

7       appellant.  So Ms. Schultz, would you like to

8       make a closing argument?

9               MS. SCHULTZ:  The Commissioner has

10      nothing further.  Thank you.

11              ALJ MARTINDALE:  And Ms. Hanks, do you

12      have any closing argument you'd like to make?

13              MS. HANKS:  No, ma'am, I don't.

14              ALJ MARTINDALE:  And do you, Mr.

15      Mehallow, have anything you'd like to argue to

16      Board as to how it should rule on behalf of your

17      client?

18              MR. MEHALLOW:  - -.

19              ALJ MARTINDALE:  Okay.  Get nice and

20      close to the phone so we pick it up.

21              MR. MEHALLOW:  Okay.  Based on the

22      testimony before us it's obvious that Mr. Eldred,

23      according to his perception of the rules, had the

24      opportunity to refuse that assignment once he got

25      there and they didn't have the terms he had sent

1    Case Duly Called

2         there—he'd been sent there on.

3              ALJ MARTINDALE:  Okay.  I'm going to

4         have to interrupt just for a second.  I'm not

5         sure whether it's your phone or mine but it's

6         fuzzy and not coming through.

7              MR. MEHALLOW:  Oh.  Judge, how's this?

8              ALJ MARTINDALE:  Much better.

9              MR. MEHALLOW:  I just switched it back

10        to the handset.

11             ALJ MARTINDALE:  Okay.

12             MR. MEHALLOW:  Must be the microphone

13        there.  Okay.  Judge, based on the testimony Mr.

14        Eldred had the ability to refuse that assignment

15        once he got there and found out it was not what

16        he'd been told when he left Syracuse.  He had

17        been informed that he had the opportunity—he had

18        the right to refuse assignments in other cases by

19        the company witnesses so he had no expectation

20        that he would not be allowed to work for the

21        company anymore if he refused.  He said he has

22        the right to that.  Now, the question on the

23        union, he's testified he had no indication he was

24        a member while he was there so he would have

25        known he would have had to contact a union

1    Case Duly Called

2    representative to grieve that.  Given the short

3    time that he was there, I don't feel that it

4    would be physically possible to give him a card

5    or a contract in that time.  He was only there

6    for one day.  So there's no indication he had any

7    belief that he had those rights to grieve it.  So

8    from these two issues, Mr. Eldred did nothing

9    that was misconduct in refusing that one

10   assignment.  He expected to go back to work for

11   Comforce in other capacities.  They just chose to

12   not retain him.  Thank you.

13        ALJ MARTINDALE:  And do you have

14   anything to say with respect to the willful

15   misrep. or the recoverable overpayment?

16        MR. MEHALLOW:  No, your honor.

17        ALJ MARTINDALE:  Okay.  And I would like

18   to thank everybody for participating over these

19   two hearings on the top of all the work you did

20   at the lower authority and the Board will be

21   getting to you within the month with a final

22   decision and is there any question that you'd

23   like to ask before I hang up and also excuse Ms.

24   Schultz?  Any question Ms. Hanks?

25        MS. HANKS:  No, ma'am.

1     Case Duly Called

2              ALJ MARTINDALE:  Any question from you,

3     Mr. Mehallow?

4              MR. MEHALLOW:  No.

5              ALJ MARTINDALE:  Any question Ms.

6     Schultz?

7              MS. SCHULTZ:  No.

8              ALJ MARTINDALE:  Then this record stands

9     closed and I'm going to hang up when Ms. Schultz

10    leaves the room.  Thank you very much, Ms.

11    Schultz.

12             MS. SCHULTZ:  Thank you.

13             ALJ MARTINDALE:  Okay.  And I thank you.

14    Let the record the parties have hung up.  Ms.

15    Schultz has left the room and this record is

16    closed.  Off the record.

This is to certify that I have typed the above record from a recording produced from an electronic sound recording system in the State of New York and that, to the best of my knowledge and belief, the above record was typed by me is a true and accurate record of the recording.

_____

Mark Hugo

For UBIQUS REPORTING, INC.
22 Cortlandt Street, Suite 802
New York, NY 10007

Date recording was transcribed:

2/13/08

E X H I B I T S

BOARD

| EXHIBIT | DESCRIPTION | I.D./IN EV |
|---------|-------------|------------|
| 1 | 2002 Union member list | 36 |